Paul A. DeCESARE, individually and on behalf of all other persons similarly situated

v.

LINCOLN BENEFIT LIFE COMPANY.

No. 2003–119–Appeal.

Supreme Court of Rhode Island.

June 23, 2004.

Geoffrey M. Millsom, Providence, for Plaintiff.

Linda Morkan, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

This appeal requires us to interpret the language of an annuity contract sold by the defendant, Lincoln Benefit Life Company (Lincoln or defendant), to a certified class of individuals represented by the plaintiff, Paul A. DeCesare (DeCesare or collectively plaintiffs). The plaintiffs appeal from a Superior Court order granting summary judgment in favor of Lincoln, finding that defendant satisfied the terms of the annuity contract when it "declared" the annuity's rate and cap by an internal e-mail, and notified the annuitants of the new rate and cap by mailing an initial, and then corrected, annual report to them within thirty days.

### Facts and Travel

Lincoln is an insurance company that offers its products to the public and has a principal place of business in Lincoln, Nebraska. One of the products it sold in 1997 was the Saver's Index Annuity (SIA or the annuity), an annuity linked to the Standard & Poor's Composite Stock Price Index (S & P Index). The SIA is an investment vehicle that provides a monthly payment to policyholders based on the accumulated value of the initial investment. The plaintiff class in this case consists of 1,188 SIA policyholders who purchased the annuity during the period January 1, 1996, through December 31, 1997, and had contract anniversary dates during the period February 7, 1998, through February 24, 1998.

The SIA accumulates value based on the performance of the S & P Index. Each year, Lincoln applies a certain percentage of the growth of the S & P Index to the annuity's accumulated value, subject to an upper limit. The percentage of the growth of the S & P Index applied each year is known as the Index Participation Rate (rate), and the upper limit is the cap. The annuity grows tax free until it vests or is otherwise liquidated.

By way of example, Lincoln established the rate of DeCesare's policy at 80 percent and the initial cap at 14 percent. In this example, if the S & P Index increased by 10 percent during the preceding year, DeCesare's policy would be credited with an 8 percent increase, derived by multiplying the rate (80 percent) by the 10 percent growth rate of the S & P Index (80 percent × 10 percent = 8 percent). The cap (14 percent) is a ceiling for the maximum percentage increase the annuity may realize in one year, and is implicated only if the result of multiplying the established rate with the growth rate of the S & P Index exceeds that number.

It is undisputed that Lincoln has the unilateral right to establish the rate and the cap on an annual basis. According to the SIA, the rate and cap are set "[a]s *declared* in advance by [Lincoln] on \* \* \* each contract anniversary." (Emphasis added.) The "declare" language appears in three places in the contract, once during a summary of the SIA's terms, and once in the definitions of "Cap"[1] and "Index Participation Rate."[2]

The SIA also contains another means of notifying the policyholders of the rate and cap to be applied each year. The last page of the SIA contract provides that annuitants will receive an "Annual Report" as follows:

"*We will send you a report not later than 30 days after each contract anniversary that shows:* the contract value, accumulated value, and surrender value at the beginning of that contract year; the amount of any withdrawals, credits and index increases during that contract year; the contract value, accumulated value, and surrender value at the end of that contract year and the *index participation rate, cap and floor applicable to the new contract year.*" (Emphasis added.)

In February 1998, plaintiffs received an annual report from Lincoln that conformed to the above description and listed the rate at 80 percent and the cap at 14 percent. However, on or about March 3, 1998, Lincoln sent a second, amended, version of the annual report to annuitants whose policies had anniversary dates from February 7

through February 24. This new version of the annual report revised downward the rate (70 percent) and the cap (12 percent) percentages for the coming year. The amended report was identical to the original in all other respects, and did nothing to reference the changes to the rate and cap or to draw the annuitants' attention to them. Significantly, although the initial report was sent to each policyholder's insurance agent, the amended report was not.

According to Lincoln, the initial rate and cap cited in the February 1998 annual report was the result of a clerical error. The defendant contends that its interest rate committee, with the assistance of the actuarial department, set the rate for 1998 at 70 percent and the cap at 12 percent, and that these rates were "declared" by Lincoln through an internal e-mail from its interest rate committee. Lincoln contends that the initial annual report contained the wrong rate and cap numbers, and that the amended report merely corrected those misstatements.

On April 21, 1999, after learning of Lincoln's amended report and attempting, unsuccessfully, to convince Lincoln to apply the rate and cap figures that appeared in the February 1998 annual report, DeCesare sued Lincoln on behalf of himself and others similarly situated. DeCesare sought certification for a class action on claims for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing. Individually, DeCe-

---

1. "Cap" is defined as "[t]he maximum index increase percentage by which your accumulated value will be increased in a contract year. The cap for the first contract year is shown on Page 3. We will *declare* the cap at each contract anniversary on a basis which does not discriminate unfairly within any class of contracts." (Emphasis added.)

2. "Index Participation Rate" is defined as "[t]he percentage of the change in the index used to calculate the index increase for a contract year. The cap for the first contract year is shown on Page 3. We will *declare* the index participation rate at each contract anniversary on a basis which does not discriminate unfairly within any class of contracts." (Emphasis added.)

sare also pursued counts for negligent misrepresentation and bad faith.

A hearing concerning plaintiffs' motion for class certification was held before the trial justice on December 4, 2001. The defendant questioned whether class certification was feasible, believing that the SIA contract contained a choice-of-law provision that required the application of the substantive law of fifty-one separate jurisdictions. According to defendants, variations of relevant law in each jurisdiction made class administration impracticable and inefficient. The defendant also argued against class certification on the ground that even if plaintiffs prevailed on the merits, each individual plaintiff's monetary damages could easily be calculated, obviating the need for the court to employ an equitable remedy.

The trial justice certified plaintiffs as a class on June 25, 2002. In his written decision, the trial justice determined that plaintiffs had met their burden of proof under Rule 23 of the Superior Court Rules of Civil Procedure. Despite apparently finding that the contract contained a choice-of-law provision, the trial justice determined that the members of the class presented questions of law and fact that were sufficiently similar to warrant class certification, and that nothing presented to him indicated that the laws of the jurisdictions involved were "so variant as to defeat predominance." He employed Rhode Island conflict-of-law principles in selecting Nebraska jurisprudence as the applicable law with which to interpret the SIA contract. He also found that equitable relief, as opposed to monetary compensation, would be required because plaintiffs were seeking injunctive relief. Accordingly, a class of plaintiffs was certified to pursue counts 1 through 3 of the complaint (declaratory judgment, breach of contract,

and breach of the duty of good faith and fair dealing).

Subsequently, plaintiffs moved for partial summary judgment on the class action claims. The defendant filed a cross-motion for partial summary judgment on those same claims. According to the trial justice, the disposition of the case rested on a singular issue: the meaning of the term "declare." The plaintiffs maintained that Lincoln declared the annual rate and cap figures when it published the initial annual report to its annuitants establishing the cap at 14 percent and the rate at 80 percent. Having been so established, plaintiffs believed that Lincoln was precluded from unilaterally altering them a month later. Lincoln argued that it had "declared" the correct rate and cap internally through an e-mail to its employees, and that the subsequent annual report containing different rate and cap figures was merely a clerical error that it was entitled to correct.

The trial justice ruled in favor of defendants, holding that the SIA did not require a public "declaration" of the rate and cap to the annuitants. The declaration requirement was satisfied by Lincoln's internal e-mail referring to the decision of the interest rate committee establishing the rate and cap at 70 percent and 12 percent respectively. The trial justice relied on the SIA contract provision that specified that *notice* of the rate and cap would be provided to annuitants through the publication of an annual report within thirty days of the anniversary date of each annuity. The trial justice reasoned that because the contract explicitly provided for notice of the rate and cap through the annual report, it would have been redundant to interpret the word "declare" to also require an additional public "declaration" to the annuitants. Accordingly, the information in the first annual report was ruled a "clerical error" that Lincoln was entitled to

correct within thirty days of each annuitant's anniversary date. Judgment in favor of defendant was entered on all class claims. The plaintiffs timely appealed.

The plaintiffs allege three errors on appeal. First, they argue that the Superior Court incorrectly interpreted the word "declare," and that the plain meaning of the word is "to make known publicly," which excludes an internal e-mail from its definition. Second, plaintiffs argue that their interpretation of the term "declare" is reasonable, and that the term's susceptibility to multiple reasonable interpretations made summary judgment inappropriate. Finally, the plaintiffs contend that the hearing justice made an impermissible finding of fact in granting summary judgment by concluding that the figures in the initial report were the result of a "clerical error."

The defendants have cross-appealed, challenging the propriety of plaintiffs' class certification. Lincoln argues that the SIA contract contained a choice-of-law provision that requires the application of the law of each plaintiff's jurisdiction. The defendant alleges that this provision destroys the pretension that common issues of law predominate, and makes the class action an inefficient mode in which to proceed. Furthermore, Lincoln contends that money damages, rather than equitable relief, is the appropriate redress for any legal harm, and that the trial justice erred in concluding that injunctive relief is warranted. Both parties agree that the propriety of class certification need be resolved only if we vacate the finding of summary judgment in favor of defendant.

## Discussion

## I

### The SIA Contract

#### A. Choice of Law

The first question we must resolve is which jurisdiction's law applies to the SIA contract. Lincoln asserts that the contract contains a choice-of-law provision that requires the application of the law of the state where each annuitant resided at the time he or she purchased the policy. The plaintiffs contend that the provision in question is merely a savings clause, similar to standard "void where prohibited" language of many open offers. The Superior Court does not appear to have squarely addressed what effect the disputed contractual provision has on the outcome of the litigation.

The disputed contractual clause is as follows:

> "**Conformity with State Law**—This contract is subject to the laws of the state in which the application was signed. If any part of the contract does not comply with the laws, it will be treated by us as if it did."

■ Ordinarily, parties to a contract are free to stipulate which law will govern the terms of their agreement. *Sheer Asset Management Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I.1999) (per curiam). Choice-of-law provisions are valid and enforceable in nearly all jurisdictions that have passed upon them. *See Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir.1996); *Shearson Lehman Brothers, Inc. v. M & L Investments*, 10 F.3d 1510, 1514–15 (10th Cir.1993); Restatement (Second) *Conflict of Laws*, § 187 (1971). This Court previously has held that choice-of-law provisions are enforceable if the intention of the parties to stipulate to the jurisdiction is made clear by *express language* or by the "facts and circumstances attending the making of the contract." *Owens v. Hagenbeck–Wallace Shows Co.*, 58 R.I. 162, 173–74, 192 A. 158, 164 (1937).

■ When determining the intent of the parties to bind themselves to a particu-

lar forum or jurisdiction, courts employ the standard principles of contract law. *Shearson Lehman Brothers, Inc.*, 10 F.3d at 1514. In Rhode Island, these principles include the familiar maxims that unambiguous terms will be given their plain and ordinary meaning. *Perry v. Garey*, 799 A.2d 1018, 1023 (R.I.2002) (citing *Dubis v. East Greenwich Fire District*, 754 A.2d 98, 100 (R.I.2000)). "[A] contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." *Id.* (quoting *Hilton v. Fraioli*, 763 A.2d 599, 602 (R.I.2000)). "If the terms are found to be unambiguous, however, the task of judicial construction is at an end and the parties are bound by the plain and ordinary meaning of the terms of the contract." *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1259 (R.I.2003).

 We are of the opinion that the provision entitled "Conformity with State Law" (the provision) is not an express stipulation of the parties' intent that the SIA is to be governed by the law of the state where each annuitant signed the SIA application. The unambiguous title of the provision establishes that its purpose is to ensure that the annuity conforms with each state's laws relating to insurance, investments and other relevant subjects, and, if not in compliance with state law, the annuity will not be held invalid by Lincoln.[3] Indeed, the second sentence of the provision makes this explicit, articulating that Lincoln will treat the SIA as enforceable even if a state law invalidates a particular provision of the contract. Conformity-with-state-law provisions do not operate as choice-of-law provisions.

*Sonoco Buildings, Inc. v. American Home Assurance Co.*, 877 F.2d 1350, 1352 (7th Cir.1989) (conformity-with-state-statutory-law provision held "irrelevant in determining which state's laws to apply").

Lincoln contends that the term "subject to" is the operative choice-of-law language, even as it concedes that the second sentence is a conformity-with-state-law provision. Although we are mindful that there is no specific wording that must be employed in a choice-of-law provision, we note that the term "subject to" is not nearly as explicit or unambiguous as the choice-of-law language this and other courts routinely recognize. *Cf. C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 415, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) (recognizing choice-of-law provision that provided that " '[t]he contract shall be governed by the law of the place where the Project is located' "); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir.2002) (choice-of-law provision stated that the " 'validity, interpretation and performance of this [Service] Agreement is to be construed and enforced in accordance with the laws of The Netherlands and the courts in Rotterdam shall be competent' "); *Sheer Asset Management Partners*, 731 A.2d at 709 (recognizing a choice-of-law provision that stated that the "agreement shall be governed by, and construed in accordance with, the laws of the State of Connecticut"); *Sears Roebuck and Co. v. Avery*, 593 S.E.2d 424, 428 (N.C.Ct.App.2004) ("We apply Arizona law since the cardholder agreement provides that '[t]his agreement * * * will be governed by and interpreted in accordance

3. Such provisions are often required by state statute in the insurance industry. *See, e.g.,* 215 Ill. Comp. Stat. 5/357.23 (2000) (requiring the inclusion of the following language in health insurance contracts: CONFORMITY WITH STATE STATUTES: Any provision of

this policy which, on its effective date, is in conflict with the statutes of the state in which the insured resides on such date is hereby amended to conform to the minimum requirements of such statutes).

with the laws of the State of Arizona * * *.' ").

In *Advani Enterprises, Inc. v. Underwriters at Lloyds,* 140 F.3d 157, 162–63 (2nd Cir.1998), the Second Circuit Court of Appeals held that the phrase "subject to English law and practice" was not dispositive of a choice-of-law issue. Although the Court ultimately concluded that English law governed the contract, it reached this conclusion because the party seeking to enforce the choice-of-law provision did not draft the policy, and, significantly, the party seeking to evade its enforcement had relied on English insurance law when it originally denied coverage. *Id.* In this instance, Lincoln drafted the contract and is therefore responsible for any ambiguity. *See Rhode Island Depositors Economic Protection Corp. v. Coffey and Martinelli, Ltd.,* 821 A.2d 222, 226 (R.I.2003). Moreover, there is no evidence in the record that Lincoln has historically followed the law of the state where the annuity application was signed in resolving claims or disputes among annuitants. Accordingly, when read in light of the provision's heading and the subsequent sentence, we are of the opinion that the disputed provision in the SIA is a savings clause and does not operate as a choice-of-law provision.

Although Lincoln points to a few published cases in which the phrase "subject to" has been construed as creating a choice-of-law provision, those cases are distinguishable. First and foremost, none of the cited cases contained a choice-of-law provision that was embedded in a self-avowed conformity-with-state-law savings clause. In two instances, a choice-of-law provision was accompanied by an unambiguous forum-selection clause, thereby deriving support from the context. *See, e.g., K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW"),* 314 F.3d 494, 496 (10th Cir.2002) (" 'Jurisdiction for all and any disputes arising out of or in connection with this agreement is Munich. All and any disputes arising out of or connection with this agreement are subject to the laws of the Federal Republic of Germany' "); *Ayers v. Baxter,* 2001 WL 294224, at * 3 (N.D.Tex.2001) (" 'This agreement shall be subject to the laws of the State of Nevada and, in the event of enforcement of this agreement, all parties agree to the jurisdiction of District Court, Clark County, Nevada, or if jurisdictional requirements are met, the United States District Court, District of Nevada.' "). In another case, the specific language of the provision is not provided, so no analysis is possible. *Educational Employees Credit Union v. Mutual Guaranty Corp.,* 50 F.3d 1432, 1435 (8th Cir.1995).

We are confronted with the suggestion by defendant that, as drafter of the SIA, Lincoln intentionally eschewed the law of its home state, Nebraska, in favor of the laws of fifty-one separate jurisdictions. Moreover, Lincoln has *strenuously* argued throughout this litigation that the laws of these jurisdictions are widely divergent— so divergent, in fact, that it is impossible for the Superior Court to properly administer a trial designed to adjudicate claims arising from the SIA. If the laws of these fifty-one jurisdictions are as divergent as Lincoln suggests, we can discern no reasonable explanation for Lincoln to subject the SIA to adjudication under so many different laws, and Lincoln has failed to provide one. Such a business decision on the part of Lincoln strikes us as not only unreasonable, but also wholly irrational, and completely lacking in evidentiary support. Accordingly, we are persuaded that the provision is what its title pronounces it to be—a conformity-with-state-law provision, not a choice-of-law provision.

In the absence of a contractual stipulation about which law controls,

Rhode Island's conflict-of-laws doctrine provides that the law of the state where the contract was executed governs. Acceptance of the offer, *Tim Hennigan Co. v. Anthony A. Nunes, Inc.,* 437 A.2d 1355, 1357 (R.I.1981), or "the final act which constitute[s] the making of the contract," *A.C. Beals Co. v. Rhode Island Hospital,* 110 R.I. 275, 285, 292 A.2d 865, 870 (1972), determines the state of completion.

■ Evidence produced during discovery in this case established that according to Lincoln's corporate policy, a SIA is not effective or binding on Lincoln until each SIA application is approved and signed at Lincoln's home office in Lincoln, Nebraska. Specifically, a Vice President of Lincoln testified that the application for the SIA was an "offer," and that "the actual mailing [of] the contract is an acceptance of that offer." Accordingly, as the Superior Court found, the final act of execution of the SIA occurred in Nebraska, and we apply Nebraska law to the claims of this case.

## II

### Construing the Contract

Having determined the appropriate jurisdictional law, we turn to the merits and the Superior Court's decision that Lincoln did not breach the terms of the SIA when it sent an amended annual report. The central issue, both in the Superior Court and on appeal, is strictly a question of law: did the internal e-mail purporting to establish the rate and cap satisfy the SIA contract requirement that Lincoln annually "declare" those percentages? Both Rhode Island, *Zarrella,* 824 A.2d at 1259, and Nebraska appellate courts, *Union Insurance Co. v. Land and Sky, Inc.,* 247 Neb. 696, 529 N.W.2d 773, 776 (1995), review questions of law *de novo.*

■ When reviewing a contract, a court's ultimate goal is to effectuate the intent of the parties at the time the contract was made. *Decker v. Combined Insurance Company of America,* 244 Neb. 281, 505 N.W.2d 719, 722 (1993). Under Nebraska law, "[w]hen the terms of [a] contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning *as the ordinary or reasonable person would understand them.*" *Guerrier v. Mid–Century Insurance Co.,* 266 Neb. 150, 663 N.W.2d 131, 134 (2003) (emphasis added); *Rumbaugh v. Rumbaugh,* 229 Neb. 652, 428 N.W.2d 500, 502 (1988). Although not dispositive, ambiguity may be created in an instrument "when a word, phrase, or provision in the [instrument] has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Guerrier,* 663 N.W.2d at 135. A contract is ambiguous only if, upon considering the contract as a whole, the language leaves uncertain which of the possible interpretations represents the true intentions of the parties. *Nogg Brothers Paper Co. v. Bickels,* 233 Neb. 561, 446 N.W.2d 729, 731 (1989).

■ We are of the opinion that the term "declare" is ambiguous as employed in the annuity contract. Lincoln contends that the term is a synonym for "establish" or "set." The plaintiffs argue that the term "declare" requires an affirmative act of publication *capable of providing* notice of the information that is the subject of the declaration. These contentions are suitably divergent that we are required to look beyond the plain language of the contract.

We note that neither the litigants nor the Court has been able to find any case law from any jurisdiction interpreting or construing the term "declare" in an annuity contract or similar context. Furthermore, none of the litigants has presented

any evidence tending to prove that the term "declare" is a term of art either in the industry or in a particular jurisdiction. To the contrary, both litigants primarily have resorted to evidence of the most general type to support their interpretations: dictionaries of the English language.

After carefully reviewing the disputed language, the SIA as a whole, and the arguments of the parties, we are of the opinion that the wholly internal e-mail is not a "declaration" as that term is used in the SIA contract. The plain and ordinary meaning of the word "declare," as it would be understood by reasonable policy holders, requires an affirmative act by Lincoln sufficient to inform policy holders of the annual rate and cap. *See Webster's Third New International Dictionary*, 586 (3d ed. 1967) (defining "declare" as "to make clear * * * to make known publicly, formally, or explicitly, [especially] by language * * * announce, proclaim, or publish"); *Blacks Law Dictionary* 415 (7th ed. 1999) (defining "declaration" as a "formal statement, proclamation, or announcement, esp. one embodied in an instrument"). A wholly internal e-mail is not an act of publication *capable* of providing notice to anyone, particularly an annuitant.[4]

 Lincoln urges this Court to construe "declare" as a synonym for "establish" or "set." Lincoln, however, failed to provide any evidence or other support for its contentions that the custom, usage or common practice of the life insurance or investment annuity industry is to use "declare" as a synonym for "establish" or "set." To the extent that such a custom or industry practice exists, it was incumbent

upon defendant to prove it so that a reviewing Court could properly credit Lincoln with such intent. Moreover, Lincoln failed to provide any evidence about its normal practice for declaring the rate and cap in previous years, and merely argued that in this instance, during the year in question, the "declaration" was an internal e-mail. Having failed to provide the requisite evidence, Nebraska law explicitly instructs that we construe the ambiguous term against Lincoln, the company that drafted the agreement. *Craig v. Hastings State Bank,* 221 Neb. 746, 380 N.W.2d 618, 621 (1986).

Unlike the Superior Court, we are not dissuaded in our interpretation by the fact that the SIA contains a notice provision requiring the publication of an annual report to annuitants providing *actual notice* of the rate and cap for the upcoming year. Our interpretation does not create a redundancy because we are not holding that a declaration must provide actual notice. Rather, as construed, Lincoln's declaration of the rate must be an overt, affirmative act of publication to entities outside the company which is *capable of providing notice.* Examples of declarations capable of providing notice include publication in newspapers or on a website, or reports to Lincoln's agents who sold the policies to the annuitants. Actual notice, in this instance a direct mailing of an annual report, must then be provided within thirty days of the date of declaration. Although the distinction is fine, it is not indiscernible, and it comports with a reasonable policy-

---

4. It strains common understanding to assert that one would normally *"declare"* something to one's self. Yet that is exactly what Lincoln has done in this instance. Corporations such as Lincoln are regarded as a single entity under the law. Harry G. Henn & John R. Alexander, *Laws of Corporations,* § 80 at 149–

52 (3d ed. 1983). Thus, an e-mail from one employee to another or every employee of the same corporation is not a communication designed to provide information to an independent entity, but rather is a wholly internal communication, not *"capable of providing notice"* to persons entitled to the declaration.

holder's understanding of what the term "declare" means.

Accordingly, given the fact that the internal e-mail was not a communication capable of providing information to someone independent from the declarant, and because Lincoln has not provided any evidence of other affirmative declarative acts beyond the internal e-mail—as it was required to do in opposition to plaintiffs' Super. R. Civ. P. 56 motion—we hold that the initial annual report was Lincoln's declaration of the rate and cap under the SIA contract as a matter of law. We further hold that Lincoln's attempt to amend the declaration was a breach of that contract. Therefore, the trial justice erred in granting defendant's motion for summary judgment and further erred when he denied plaintiffs' motion for summary judgment.

## II

### Class Certification

Having determined that the Superior Court's decision granting summary judgment in favor of Lincoln must be reversed, we address Lincoln's cross-appeal from the trial justice's decision to certify plaintiffs as a class. A class action is a procedural vehicle that serves the interests of judicial economy by permitting a representative with claims or defenses that are typical of the group to represent a class of similarly situated individuals who are too numerous to practicably join in the litigation. *See Zarrella*, 824 A.2d at 1262 (citing *Cabana v. Littler*, 612 A.2d 678, 685 (R.I.1992)). In Rhode Island, class certification is governed by Rule 23 of the Superior Court Rules of Civil Procedure, which is identical to its federal counterpart. To be certified, a class must satisfy the requirements set forth in Rule 23(a), and qualify in one of three categories described in subsection 23(b) of the Rule.

Rule 23(a) establishes four basic "prerequisites" to class certification. First, the class must be so numerous that joinder of all members is impracticable. Second, there must be common questions of law and fact among members of the class. Third, the claims of the class representative must be typical of the claims and defenses of the class. Fourth, the representative parties must demonstrate that they are able to adequately represent the interests of the class. *Id.* Only after these prerequisites are established is Rule 23(b) implicated.

Rule 23(b) provides that a potential class also must qualify under one of three subsections. In this case, plaintiffs attempted to have the class certified under two subsections: subsection (b)(2) of Rule 23, which requires that:

> "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole,"

and subsection (b)(3), in which the court must find:

> "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The Superior Court found that plaintiffs had met their burden of proof under the four prerequisites of Rule 23(a), as well as subsections (2) and (3) of Rule 23(b). With respect to Rule 23(a), the trial justice held that the numerosity requirement was satisfied by the fact that the proposed class included approximately 1,188 members. The court held that commonality existed because all the proposed class members "purchased substantially identical policies,

agreed to the same contract terms and were all allegedly harmed by Lincoln's actions between February and March 1998," and their claims turned on the "same legal principles." The court ruled that DeCesare's claims were typical of the class because they were based on policy documents common to all class members and affected by a uniform course of conduct by Lincoln. The adequacy requirement was satisfied because there was no conflict of interest between DeCesare and any of the class members and because DeCesare's counsel was qualified, experienced, and endowed with the necessary resources to conduct the litigation on behalf of the class.

After determining that the four prerequisites of Rule 23(a) were satisfied, the Superior Court considered whether this case could be maintained as a class action under Rule 23(b). The court determined that the class was certifiable under Rule 23(b)(2) because Lincoln had acted on grounds generally applicable to the class as a whole, thereby making final injunctive relief appropriate with respect to the entire class. The court also held that the class qualified under Rule 23(b)(3) because common questions of law or fact predominated over questions affecting individual members of the class, and that a class action was superior to other available methods for the fair and efficient adjudication of the controversy.

Lincoln argues on appeal that the trial court made two errors. Lincoln's primary argument challenges the determination that common questions of law or fact exist or predominate among the members of the class. This argument is based on the theory that the Superior Court inappropriately discounted the common-law and statutory distinctions among the various jurisdictions and that the differences in state law defeat the claims of commonality under Rule 23(a)(2) or predominance under Rule 23(b)(3). Lincoln also contends that the relief sought by plaintiffs was monetary, not equitable in nature, and that the Superior Court erred in certifying the class under Rule 23(b)(2).

## A

### Standard of Review

■ A prospective class bears the burden of proving that the requirements of Rule 23 are met. The United States Supreme Court has admonished trial courts to conduct a "rigorous analysis" of the prerequisites to a class action before a class may be certified under Rule 23 of the Federal Rules of Civil Procedure. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Markarian v. Connecticut Mutual Life Insurance Co.*, 202 F.R.D. 60, 63 (D.Mass.2001). Moreover, when examining the "predominance" and "superiority" requirement of Rule 23(b)(3), the trial court must take a " 'close look' at the difficulties likely to be encountered in the management of a class action." *Markarian*, 202 F.R.D. at 63 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614–17, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). This "close look" necessarily entails the trial court's delving into " 'considerations * * * enmeshed in the factual and legal issues comprising [a] plaintiff's cause of action.' " *Markarian*, 202 F.R.D. at 63.

■ This Court applies the same deferential standard of review to a Superior Court's decision to certify a class pursuant to Rule 23 that it applies to findings of fact made by a trial justice sitting without a jury. *Zarrella*, 824 A.2d at 1262; *Cabana*, 612 A.2d at 685. A trial court's decision to certify a class is accorded great deference and will not be disturbed unless the trial court misconceived material evi-

dence, substantially abused its discretion or was otherwise clearly wrong. *Zarrella,* 824 A.2d at 1262.

## B

### Certification Under Rule 23(a)

Lincoln's primary argument on the cross-appeal is that the Superior Court erred in concluding that common questions of law existed or predominated among the class members. This argument is based on the fact that Lincoln believed the SIA contained an effective choice-of-law provision requiring the application of the substantive law of fifty-one separate jurisdictions to the class claims. Lincoln provided the Superior Court with an extensive memorandum setting forth the differences between each state's substantive law for each of the class action claims. Lincoln contends that the Superior Court misapprehended the significance of this submission when it determined that common legal questions predominated. If Lincoln is correct, plaintiffs would be unable to establish the existence of common issues of law under Rule 23(a)(2), or that DeCesare's claims were typical of the claims of the class as a whole, as required by Rule 23(a)(3).

We are sympathetic to Lincoln's reasoning, but because we already have held that the SIA does not contain a choice-of-law provision and that Nebraska law governs plaintiffs' claims, we reject this argument. Furthermore, the SIA policy language and the course of conduct by Lincoln are identical across the entire class. Such factual and legal uniformity is clearly sufficient to establish commonality under Rule 23(a)(2) and typicality under Rule 23(a)(3). *See, e.g., Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d 32, 42 (1st Cir.2003) (holding that common issues of law and fact predomi-

nate where case turns on interpretation of a form contract executed by all class members and defendant). "Thus, the only questions affecting individual members of the class in this case are damages. The need for individual damages calculations, however, does not diminish the appropriateness of class action certification where common questions as to liability predominate." *Seidman v. American Mobile Systems, Inc.,* 157 F.R.D. 354, 366 (E.D.Pa. 1994); *see also In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 139–40 (2nd Cir.2001).

Lincoln does not contend that plaintiffs are not numerous enough to proceed as a class, or that DeCesare or his counsel is not equipped to handle this litigation. Therefore, we are satisfied that plaintiffs have met the threshold requirements under Rule 23(a), and we proceed to examine the propriety of certification under Rules 23(b)(2) and (b)(3).

## C

### Certification Under Rule 23(b)(2)

Rule 23(b)(2) provides that a class action is appropriate when "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class," and the representatives are seeking "final injunctive relief or corresponding declaratory relief." The advisory committee notes to the federal rule make clear that Rule 23(b)(2) is intended to address those cases in which broad, class-wide injunctive or declaratory relief is necessary. *See* Advisory Committee Notes to Fed.R.Civ.P. 23(b)(2) at 128 (contemplating certification if behavior concerns "class as whole"). "Stated another way, this rule seeks to redress what 'are really group, as opposed to individual injuries.'" *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 975 n. 22 (5th Cir.2000) (quoting *Barnes v. American Tobacco Co.,* 161 F.3d

127, 143 n. 18 (3d Cir.1998)). Broken into its component parts, a prospective class must establish two factors under this subsection: "(1) the opposing party's conduct or refusal to act must be 'generally applicable' to the class [as a whole], and (2) final injunctive or corresponding declaratory relief must be requested for the class." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 1775 at 447–48 (1986).

▨ The facts of this case easily establish that Lincoln's actions were generally applicable to the class as a whole. Each member of the class purchased the same contract containing identical terms. Each member of the class received an annual report from Lincoln that listed the rate at 80 percent and the cap at 14 percent for the upcoming year, and then received a second, amended, version of the annual report, revising the rate and cap downward, to 70 percent and 12 percent respectively. Lincoln's behavior toward each member of the class was beyond generally applicable; it was identical. The parties do not strenuously contend otherwise.

▨ The parties wage a pitched battle, however, concerning the remedy that plaintiffs have requested and whether it is equitable or legal in nature. Much is at stake. A court may not certify a class under Rule 23(b)(2) if "the appropriate final relief relates exclusively or *predominantly* to money damages." Advisory Committee Notes to Fed.R.Civ.P. 23(b)(2) at 128 (emphasis added); *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 564 (2nd Cir. 1968) ("[Rule 23(b)(2)] * * * is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory").

▨ To be sure, plaintiffs are seeking a declaratory judgment concerning the meaning of the term "declare," and their prayer for relief contains a request that Lincoln "credit" their SIA accounts the difference between the rate and cap which they were entitled, and the reduced rate and cap that Lincoln actually applied. The defendant claims these remedies, though technically equitable, are easily ascertainable and strictly monetary—no more than the difference between the value of each SIA now and the value of each SIA if the higher rate and cap had been applied. "Insignificant or sham requests for injunctive relief should not provide cover for [Rule 23](b)(2) certification of claims that are brought essentially for monetary recovery." *Robinson v. Metro–North Commuter Railroad Co.,* 267 F.3d 147, 164 (2nd Cir.2001) (citing *In re Sch. Asbestos Litig.,* 789 F.2d 996, 1008 (3d Cir.1986)); *see also Jaffee v. United States,* 592 F.2d 712, 715 (3d Cir.1979) ("A plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money."). Lincoln argues that if it is found liable to plaintiffs, plaintiffs could be made whole through an award of money damages just as easily as equitable relief.

▨ We are not persuaded that a damage calculation is as simple as defendant suggests. Declaratory relief is essential because plaintiffs and defendant are engaged in a long term contractual relationship, and clarification of the rights accruing under the SIA is critical. Moreover, injunctive relief requiring Lincoln to credit retroactively each class member's annuity the prorated difference between the value of annuity if the 80 percent rate and 14 percent cap had been properly applied, and the value of the annuity with the reduced rate and cap, as opposed to compensatory damages, is entirely appropriate. Although plaintiffs' damages may be measured in terms of money, because the SIA is a multiyear contractual relationship,

a guarantee that Lincoln will perform under the agreement is the real relief the class is seeking. Such requests for specific performance of a contract are routinely recognized as an appropriate subject for Rule 23(b)(2) class certification. *See, e.g., Bradford v. AGCO Corp.,* 187 F.R.D. 600, 605 (W.D.Mo.1999) (certifying class of retirees under Fed.R.Civ.P. 23(b)(2) when class "sought injunctive relief by requiring the defendant to perform their contractual obligations"); *Groover v. Michelin North America, Inc.,* 187 F.R.D. 662 (M.D.Ala. 1999) (same).

There is no evidence that plaintiffs' request for injunctive relief is a procedural sham designed to win class certification. To the contrary, we are satisfied that equitable relief is the only way to restore fully plaintiffs to the position they bargained for under the SIA. One of the main benefits of an annuity is that it grows tax-deferred. This was undoubtedly the investment's attraction for many of the annuitants, and an important consideration in their decision to purchase the SIA. Lincoln's proposal to pay compensatory damages and have class members repurchase annuities with that money does not fully address this issue, nor does it make plaintiffs whole. Payment of damages to class members would be an immediately taxable event. Even if the class members were able to turn around and repurchase the annuity, they still would be responsible for a tax liability and any additional costs associated with such a purchase. Accordingly, injunctive relief is the only relief that restores fully the class to its previous position.

## D

### Certification Under Rule 23(b)(3)

 Having determined that class certification is appropriate under Rule 23(b)(2), the Superior Court should not have proceeded to certify the class under Rule 23(b)(3). The general rule is as follows:

> "Although classes often qualify under more than one of the Rule 23(b) categories, courts generally prefer to certify classes under Rule 23(b)(1) or (2) before certifying under Rule 23(b)(3). *See De-Boer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1175 (8th Cir.1995); 5 James W. Moore et al., *Moore's Federal Practice* § 23.40[2]. The reason for this preference is that members of a class certified under Rule 23(b)(1) or (2) cannot opt out of the action, while members of a class certified under Rule 23(b)(3) are entitled to opt out and pursue individual suits. *See DeBoer,* 64 F.3d at 1175. Individual claims brought by members opting out of the class might prejudice other class members or cause inconsistencies and compromises in future litigation. *See id.*" *Borcherding–Dittloff v. Transworld Systems, Inc.,* 185 F.R.D. 558, 562 (W.D.Wis.1999).

Thus, courts prefer that classes proceed under Rule 23(b)(2) because of its broader *res judicata* effect. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 252–53 (3d Cir.1975); 7A Charles Alan Wright et al., at § 1775. Courts should proceed under Rule 23(b)(3) only when the class is heterogeneous in composition, thereby necessitating the additional procedural protections afforded by opt-out and notice. *Wetzel,* 508 F.2d at 253. In this case, the class members are entirely homogenous, presenting identical questions of fact and law. Certification under Rule 23(b)(2) alone suffices.

### Conclusion

The judgment of the Superior Court is affirmed in part and reversed in part. The decision of the trial justice certifying this case as a class action under Rule 23(b)(2) is affirmed. The decision certify-

ing this case as a class action under Rule 23(b)(3) is reversed. The judgment in favor of the defendant on the class action claims is vacated. The case shall be remanded to the Superior Court for the entry of judgment in favor of the plaintiffs' declaratory judgment and breach of contract claims, and for additional proceedings not inconsistent with this opinion.