# United States Court of Appeals
## For the First Circuit

Nos. 07-2806
    07-2821

EMHART INDUSTRIES, INC.,

Plaintiff-Appellee, Cross-Appellant,

v.

CENTURY INDEMNITY COMPANY, as an indirect successor to
Insurance Company of North America,

Defendant-Appellant, Cross-Appellee,

HOME INSURANCE COMPANY; NORTH RIVER INSURANCE CO.;
ONEBEACON AMERICA INSURANCE COMPANY; US FIRE INSURANCE CO.,

Defendants, Cross-Appellees,

LIBERTY MUTUAL INSURANCE COMPANY,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Torruella, Boudin, and Howard,
Circuit Judges.

John L. Altieri, Jr., with whom Boutin & Altieri, P.L.L.C.,
Lawrence A. Nathanson, and Siegal & Park, was on brief for Century
Indemnity.
Jack R. Pirozzolo, with whom John A. Shope, Sarah Cooleybeck,
Kirk G. Hanson, David E. Cole, Jeremy A.M. Evans, and Foley Hoag

LLP, was on brief for Emhart Industries.

 Kevin J. O'Connor, with whom Peter C. Netburn, and Hermes, Netburn, O'Connor & Spearing, P.C., was on brief for OneBeacon America.

 Mark T. Nugent, with whom John T. Harding and Morrison Mahoney LLP, was on brief for North River.

_____

March 13, 2009

_____

**TORRUELLA**, **Circuit Judge**.  This insurance coverage dispute arises from efforts by the Environmental Protection Agency ("EPA") to remediate contamination at the Centredale Manor Superfund site (the "Site") in North Providence, Rhode Island.

In 2000, the EPA designated Plaintiff-Appellee/Cross Appellant Emhart Industries, Inc. ("Emhart") a Potentially Responsible Party ("PRP") for the cleanup costs of the Site under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.  Consequently, Emhart made a demand for coverage on its insurers, which include Defendant-Appellant/Cross-Appellee Century Indemnity Company ("Century"), and Defendants/Cross-Appellees The North River Insurance Company ("North River") and OneBeacon America Insurance Company ("OneBeacon").  Emhart later sued Century, OneBeacon, and North River, among others, to cover its cleanup and defense costs.

After trial, a jury found that Century, OneBeacon, and North River did not owe Emhart coverage for cleanup costs. However, the district court awarded summary judgment for Emhart on its claim that Century owed it a duty to defend in the EPA matter. The district court later found that Century breached that duty and assessed the total costs of defense of the underlying EPA action as damages, but only up to the date of the jury's finding that Century did not owe a duty to indemnify.

Century appeals the allowance of summary judgment in Emhart's favor as to Century's duty to defend. In the alternative, Century contends that it should not be saddled with the entirety of the defense costs incurred up to the jury finding. Emhart cross-appeals, contending that the duty to defend continues, that it is entitled to total indemnity costs for Century's breach of the duty to defend, and that the district court committed various errors with respect to the jury verdict.

After careful consideration, we affirm the district court with respect to all issues on appeal.

## I. Background

The following derives from the extensive record, which includes the parties' stipulations, trial testimony, and other evidence submitted at trial and at a post-trial evidentiary hearing.

### A. Factual Background

#### 1. The Contamination of the Site

The Site totals a little over nine acres. It is bordered on the west by the Woonasquatucket River and on the east by a drainage swale that empties into a wooded wetland to the south. The Site is a flood plain for the river.

From 1944 to 1968, Atlantic Chemical Company, which later became Metro-Atlantic, Inc. ("Metro-Atlantic"), leased a portion of the Site, where it operated a chemical plant. Beginning in 1964,

and for a period of less than one year, Metro-Atlantic manufactured hexachlorophene, a substance used in pHisoHex disinfecting soap. Dioxin is a byproduct of the hexachlorophene manufacturing process. Even at very low levels, dioxin poses significant risks to human and ecological health.

During this time, from 1952 to 1969, an unrelated company, New England Container Corporation ("NECC"), operated a steel drum reconditioning facility on a portion of the Site. NECC refurbished drums from at least two companies that manufactured and sold 2,4,5-trichlorophenol, which yields dioxin when combusted. Refurbishing of the drums requires the dumping of the chemical residue inside the drums and then incinerating the insides. Other fires and incineration at the NECC facility may have contributed to the dioxin contamination. Flooding also may have dispersed dioxin onto the Site from other areas.

In 1968, Metro-Atlantic merged with Crown Chemical Corporation to form Crown-Metro, Inc. ("Crown-Metro"), and thereafter ceased operations at the Site as of the merger date. Through a series of mergers and acquisitions, Emhart became the corporate successor to Metro-Atlantic and Crown-Metro.

## 2. **The EPA Action**

The EPA first discovered dioxin on the Site in 1998. On June 21, 1999, the EPA issued a Request for Information to Emhart concerning the Site pursuant to § 104(e) of CERCLA, 42 U.S.C.

§ 9604(e), and pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6927.

On February 28, 2000, after preliminary studies and investigations, the EPA sent Emhart a Notice of Potential Liability under CERCLA for the Site (the "PRP Letter"), identifying Emhart as a PRP. Among other things, the PRP Letter required Emhart to pay costs of $947,140.89 incurred to date, as well as future costs, and mandated such actions as constructing a soil cap, implementing flood control measures, and removing contaminated soil and river sediments. The PRP Letter also identified five other PRPs, including NECC, but Emhart remains the only PRP that is financially viable. Liability under CERCLA is strict as well as joint and several.

On April 12, 2000, the EPA issued to Emhart and others a Unilateral Administrative Order for Removal Action (the "UAO") requiring that certain remedial work be performed on the Site. The EPA has also issued a second and third Unilateral Administrative Order for Removal Action (the "second UAO" and "third UAO," respectively). The anticipated cost of remediation is likely to exceed $100 million.

### 3. Century and Emhart

From the beginning of the EPA action, Emhart and Century scuffled over coverage. Some of this scuffling is relevant to this appeal.

On July 21, 1999, shortly after issuance of the Request for Information, Emhart's broker sent a letter giving notice of the Request for Information to Century and other "Interested Underwriters," seventeen in all. The letter demanded that each recipient provide "defense and indemnification" and advised the insurers that Emhart had already secured outside counsel, Swidler Berlin, to provide a "prompt and proper" defense. The letter identified four excess policies issued by Century, but did not list the Century policies at issue in this case. The broker also forwarded, along with the Request for Information, a memorandum detailing the various mergers and transactions that resulted in Emhart's succession to the rights of Crown-Metro under the policies. As with the Request for Information, on March 14, 2000, Emhart forwarded copies of the PRP Letter to the same group of insurers. On April 21, 2000, Emhart sent copies of the UAO to the same group. Emhart has also engaged in individual communications with one of its insurers, Liberty Mutual. Liberty Mutual would later settle with Emhart for $250,000.

On November 22, 2000, after issuance of the UAO, Emhart's attorney wrote Century seeking information, for the first time, regarding policies issued to Crown-Metro. The letter attached a 1969 excess policy which Emhart had recently located, and requested that Century conduct a review of its records for any other policies it may have issued to Crown-Metro. The 1969 policy attached to

that letter is the Century excess policy ("the Century Excess Policy") at issue in this case.

Initially, by letter dated December 12, 2000, Century refused to perform a broad search and denied coverage on the Century Excess Policy, stating that, because Crown-Metro had merged into Emhart after the expiration of the Century Excess Policy, Emhart was not entitled to coverage. On January 3, 2001, Emhart responded by reiterating its request for a broad search. Emhart also reiterated facts (facts previously provided in the memorandum accompanying its mass notices) that it was a corporate successor to Crown-Metro, and asked Century to reconsider its position on corporate succession.

On January 11, 2001, Century informed Emhart that it reversed its position, and stated that Emhart may have succeeded to Crown-Metro's insurance policies. However, Century insisted that Emhart had to provide proof of exhaustion of the underlying policy (which neither party had located yet) in order to obtain the benefits of the Century Excess Policy.

Emhart subsequently filed this lawsuit on January 25, 2002. On August 29, 2002, Century commenced a new search for possible policies, prior to any discovery requests made by Emhart. During this second search, in October 2002, Emhart served document requests and interrogatories relating to, among other things, any Century policies insuring Crown-Metro.

The second search finally identified the Century primary policy ("the Century Primary Policy") sometime around January 2003, but it was not disclosed to Emhart until July 10, 2003. Consequently, on January 27, 2004, Century moved to amend its answer to add a counterclaim seeking a declaration that it had no duty to defend or indemnify under the Century Primary Policy. Century then denied coverage two days later, on January 29, 2004. Emhart's counterclaim-in-reply sought a declaration that Century owed duties to defend and indemnify under the Century Primary Policy.

**B.  The Policies**

There are four policies at issue in this appeal: (1) the Century Primary Policy, (2) the Century Excess Policy, (3) an umbrella excess policy issued by OneBeacon (the "OneBeacon Policy"), and (4) an excess policy issued by North River (the "North River Policy").

### 1.  The Century Primary Policy

Century issued the Primary Policy to Crown-Metro in February 1969, two months after Crown-Metro's merger with Metro-Atlantic and concurrent termination of all Metro-Atlantic operations at the Site.  The Century Primary Policy was in effect from February 15, 1969 to January 1, 1970, with a coverage limit of $100,000.  The insuring agreement of the 1969 primary policy provides:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

The Policy provides that "[t]his insurance applies only to . . . property damage which occurs during the policy period." "Property Damage" is defined as "injury to or destruction of tangible property."

The Policy defines "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in . . . property damage neither expected nor intended from the standpoint of the Insured."

## 2. **The Century Excess Policy**

The Century Excess Policy was in effect during the period from December 1, 1968 to January 1, 1970. The limits of liability are $1 million in excess of the $100,000 of coverage provided under the Century Primary Policy.

The Excess Policy, which is substantially similar to the Century Primary Policy, provides that it "will indemnify the

insured for ultimate net loss in excess of the retained limit." Moreover, it provides that:

> If limits of liability of the underlying insurance are exhausted because of . . . property damage . . . during the period of this policy [Century] will have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage . . . even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.

Unlike the Century Primary Policy, the Century Excess Policy contains a "waste products" exclusion, providing that the Policy "shall not apply to . . . [i]njury to or destruction of property caused by intentional or willful introduction of waste products, fluids or materials . . . into any soil or inland or tidal waters, irrespective of whether the insured possessed knowledge of the harmful effects of such acts."

### 3. The OneBeacon Policy

The OneBeacon Policy, issued to Crown-Metro under the name of the Employers' Surplus Lines Insurance Company, was an umbrella policy with limits of $4 million in excess of the $1.1 million coverage provided by the Century Primary and Excess Policies. This Policy was in effect from April 24, 1969 to January 1, 1970. The OneBeacon Policy incorporates the terms and conditions of the Century Excess Policy with respect to the duty to

-11-

defend and duty to indemnify.  However, unlike the Century Excess Policy, there is no exclusion for "waste products."

### 4.  **The North River Policy**

The North River Policy, a "Commercial Comprehensive Catastrophe Liability Policy," insures Emhart and its predecessor. The policy period ran from January 1, 1984 to December 31, 1984. The North River Policy provided $15 million of property damage coverage in excess of $1 million.  Under the policy, North River

> agrees to pay on behalf of the Insured the ultimate net loss in excess of the retained limit hereinafter stated, which the Insured may sustain by reason of the liability imposed upon the Insured by law or assumed by the Insured under contract, for . . . Property Damage Liability . . . arising out of an occurrence.

Similarly to the Century and OneBeacon Policies, an "occurrence" is defined as "[i]njurious exposure to conditions which results in . . . Property Damage neither expected nor intended from the standpoint of the Insured."  The North River Policy also contains a pollution exclusion.  Of significance to this appeal, the pollution exclusion contains a standard exception for releases or dispersals that are "sudden and accidental."

### C.  **Procedural History**

After the filing of the suit and the various counterclaims, Emhart moved twice for summary judgment with respect to Century's duty to defend.  The district court denied both of Emhart's motions, in orders dated May 17, 2005 and August 4, 2006.

The May 17, 2005 order resulted from an extensive report and recommendation by a magistrate judge issued on February 15, 2004. That report, which the district court adopted in full, focused on the Century Excess Policy, and denied summary judgment as to indemnification and defense costs "[u]ntil a determination of [Century's] obligation under [the Century Primary Policy] has been made." The report also found separately that New York law applied to the North River Policy.

The August 4, 2006 order resulted from rulings made on the bench by the district court the previous day. With respect to Century's duty to defend, the district court ruled from the bench that such a duty turns on Century's duty to indemnify, and subsequently denied summary judgment because of factual disputes regarding the duty to indemnify.

In the fall of 2006, the district court conducted a six-week trial on the issue of indemnity. On October 19, 2006, the jury returned a verdict, responding to questions concerning issues pertinent to whether Century, OneBeacon, and North River owed a duty to indemnify. With respect to Century and OneBeacon, the jury found that the dioxin contamination was not "discoverable in the exercise of reasonable diligence" during the relevant policy periods. With respect to North River, the jury found that the pollution exclusion barred coverage. The effective result of the verdict, which the district court would memorialize in a later

final judgment, was to find that Century, OneBeacon, and North River owed no duty to indemnify.

After trial, the district court returned to the issue of whether Century owed a duty to defend, ordering the parties to file supplemental briefing. In an order dated May 1, 2007, the district court awarded summary judgment in Emhart's favor, holding that Century owed Emhart a duty to defend under both the Century Primary Policy and Century Excess Policy. The district court further held that Century's duty to defend ceased as of the date of the October 19, 2006 jury verdict. In the same order, the district court found that Emhart had not shown that OneBeacon owed a duty to defend, as it had not shown that the Century Excess Policy was exhausted. The district court then scheduled an evidentiary hearing to determine the extent of Emhart's defense costs, the amount of those costs that Century should bear, whether Century breached its duty to defend under either (or both) Policies, and the appropriate damages if Century did breach its duty.

In June and July 2007, the district court conducted a post-trial evidentiary hearing on the issues identified in its May 1, 2007 order. On September 26, 2007, the district court issued a memorandum and order that addressed these issues, provided its reasoning for its rulings in the May 1, 2007 order, and addressed other pre- and post-trial motions. See Emhart Indus., Inc. v. Home Ins. Co., 515 F. Supp. 2d 228 (D.R.I. 2007).

-14-

In its memorandum and order, the district court explained, in an early footnote, its reluctance to address the duty to defend issue until after the trial on the duty to indemnify. It stated:

> This odd chronology is in great part due to the complexities of this case, and in some small measure to this writer's reluctance to find a duty to defend at all. As the reader will see below, the Rhode Island Supreme Court has not had occasion to apply its relevant precedents to circumstances quite like these.

Id. at 233 n.8. Nevertheless, the district court held that Century owed a duty to defend under both Policies because they satisfy the "pleadings test" under Rhode Island law, since "the charging documents," in this case the PRP Letter, the UAO, the second UAO, and the third UAO, alleged claims that were "potentially within the . . . risk of coverage." Id. at 237-43 (Primary Policy); id. at 243-46 (Excess Policy). In so ruling, the district court noted that "[t]he application of the pleadings test here may seem unduly burdensome on Century, but Rhode Island precedents are clear." Id. at 246.

Ruling that Century had a duty to defend, the district court further found that Century had, in fact, breached its duty, and that Century owed damages in the amount of approximately $4.2 million, the total costs of defense of the underlying EPA action and related proceedings up to the date of the jury verdict finding no coverage. Id. at 250-57. Of significance to this appeal, the

district court also held that Emhart was not entitled to total indemnity costs as damages for Century's duty to defend. Id. at 263.

The September 26, 2007 memorandum and order also addressed other issues pertinent to this appeal. The district court rejected OneBeacon's claim that it was entitled to reformation of the OneBeacon Policy to include the "waste products" exclusion found in the Century Excess Policy, but, in any event, found no coverage since the Century Policies had not been exhausted. Id. at 246-50. The district court also explained its prior rejection of Emhart's request for a "continuous trigger" jury instruction, rather than a "discovery/manifestation/discoverability trigger" instruction, holding that such a "continuous trigger" instruction had not yet been adopted by Rhode Island courts. Id. at 265. The district court likewise rejected Emhart's request to certify the instruction issue to the Rhode Island Supreme Court. Id. The district court further rejected Emhart's claim that it failed to use an "objective" standard in its trigger jury instruction. Id. With respect to the North River Policy, the district court rejected Emhart's claim that Rhode Island law applied to the Policy, instead relying on the magistrate judge's report to hold that New York law applied. Id. at 266. The district court further rejected Emhart's claim that the court erred

in its instruction concerning the "sudden and accidental" exclusion in the North River Policy.  Id. at 267-68.

On November 17, 2007, the district court issued a final judgment that consolidated and memorialized its various findings and rulings.  This appeal and cross-appeal followed.

## II.  Discussion

The parties present several issues in this appeal and cross-appeal.  We address each in turn.

### A.  Century's Duty to Defend

#### 1.  Application of the Pleadings Test

In its appeal, Century challenges the district court's allowance of summary judgment in Emhart's favor, holding that Century owed a duty to defend to Emhart under both the Century Primary Policy and the Century Excess Policy. We review a district court's award of summary judgment de novo.  First Marblehead Corp. v. House, 473 F.3d 1, 5 (1st Cir. 2006).  We may affirm summary judgment on any ground manifest in the record.  See CMI Capital Mkt. Inv., LLC v. González-Toro, 520 F.3d 58, 60 (1st Cir. 2008).

Century contends that the district court erred in applying the "pleadings test" to both Policies to determine whether Century owed a duty to defend.  The "pleadings test" under Rhode Island law "requires the trial court to look at the allegations contained in the complaint, and if the pleadings recite facts

-17-

bringing the injury complained of within the coverage of the insurance policy, the insurer must defend irrespective of the insured's ultimate liability to the plaintiff." Shelby Ins. Co. v. Ne. Structures, Inc., 767 A.2d 75, 76 (R.I. 2001) (internal quotation omitted); see also Employers' Fire Ins. Co. v. Beals, 240 A.2d 397, 402-03 (R.I. 1968). "[I]n other words, when a complaint contains a statement of facts which bring the case within or potentially within the risk coverage of the policy, the insurer has an unequivocal duty to defend." Beals, 240 A.2d at 403.

As background, the district court, despite some reluctance, addressed whether Century owed a duty to defend by applying the pleadings test to the "charging documents" in this case, which the district court identified as the PRP Letter and the first, second, and third UAOs. Emhart, 515 F. Supp. 2d at 237. The documents alleged that "[h]azardous substances were disposed of at the Site as part of the former operations of several chemical companies," and that Emhart "is . . . a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971." Id. (quoting the UAO, and noting that the other charging documents echo these allegations). Although the charging documents alleged "hazardous substances were disposed of" during the relevant policy periods, they were silent as to whether such substances were "discoverable at the Site in 1969," which the district court found to be a

-18-

requirement to allege an "occurrence" under the Century Policies. See id. at 238; see also CPC, Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647, 649 (R.I. 1995) (holding that "an 'occurrence' under a general liability policy takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable."). The charging documents were silent on the issue of discoverability because it is irrelevant for purposes of determining CERCLA liability. See generally 42 U.S.C. § 9607 (a)(2).

The district court construed such silence against Century, and found a duty to defend because of "Century's failure to establish the absence of any such potential" for coverage. Emhart, 515 F. Supp. 2d at 239. Moreover, the district court rejected Century's plea to look at extrinsic evidence outside the charging documents to show the absence of coverage, noting that the "duty to defend exists, if at all, 'regardless of the actual details of the injury or the ultimate grounds on which the insured's liability to the injured party may be predicated.'" Id. at 240 (quoting Beals, 240 A.2d at 402).

On appeal, Century does not contend that the district court misapplied the pleadings test. Rather, it argues that the district court's decision to use the pleadings test was error. In essence, Century builds upon the district court's rumination that

-19-

"the Rhode Island Supreme Court has not had occasion to apply its relevant precedents to circumstances quite like these," id. at 233 n.8 (emphasis added), to argue that the Rhode Island Supreme Court would not apply its "relevant precedents" to a case like this.

Century argues that extending the application of the pleadings test to this case would contravene the purposes of the test, which Century maintains are twofold: (1) to ensure a prompt defense of the suit and (2) to avoid litigating in the coverage case an issue to be decided in the merits case. For support, Century relies on Beals, a Rhode Island Supreme Court case that provided one of the first articulations of the pleadings test. See 240 A.2d at 402. Beals involved a declaratory judgment action brought by the insurer over whether it owed a duty to defend and indemnify to an insured, a child who caused injuries to a schoolmate with a pencil. Id. at 399. Noting that a declaratory judgment action is "[o]ftentimes . . . the most expeditious and fairest method by which" to determine coverage, the Court nevertheless upheld the trial court's dismissal of the action to avoid a "'dress rehearsal of an important issue to be tried in the injury suit.'" Id. at 400-01.

As to a prompt defense of the suit, Century points out that Emhart was able to select its own counsel, Swidler Berlin, well before it sent any notice to any insurer, that it incurred approximately eighteen months worth of expenses prior to locating

the Century Policies at issue in this case, and that, rather than having to rely on a single insurer, Emhart had multiple insurers to choose from to provide a defense. According to Century, Emhart did not require a prompt defense, but reimbursement. As to avoidance of litigation of merits issues, Century argues that there was no risk of litigating in the coverage case an issue to be decided in the EPA action, since, as noted by the district court, "the charging documents" were "silent with respect to whether dioxin was discoverable at the Site in 1969," the determinative fact for purposes of coverage. Emhart, 515 F. Supp. 2d at 238. With neither purpose met, Century argues that the Rhode Island Supreme Court, per Beals, would not apply the pleadings test to this case.

Century reads too much into Beals. In Beals, the Rhode Island Supreme Court addressed whether the trial court abused its discretion in dismissing the declaratory judgment action, since, under Rhode Island law, the granting of a declaratory judgment is "purely discretionary." 240 A.2d at 400-01. As put by the Rhode Island Supreme Court, "[t]he narrow issue raised by this appeal is whether or not the trial justice in denying insurer's request for a declaratory judgment so abused his discretion as to warrant a reversal of his actions." Id. at 400. It was in the context of this "narrow issue" that the Rhode Island Supreme Court discussed its concern with "expeditious" resolution of the coverage issue and the need to avoid a "dress rehearsal" of any merits issues. Only

after finding that the trial court did not abuse its discretion did the Rhode Island Supreme Court make a "comment relative to the duty owed by an insurer to the insured" and discussed the "pleading test." Id. at 402. Thus, the "purposes" that Century identifies go to the appropriateness of declaratory relief, not the appropriateness of applying the pleadings test.

In fact, in Beals and subsequent case law, the pleadings test has only been circumscribed in very narrow circumstances not applicable here. As articulated in Beals, the pleadings test applies when the policy provides coverage "even if any of the allegations of the suit are groundless, false or fraudulent." See id. at 399 (quoting language of policy at issue); see also id. at 402 ("As a general rule, where the particular policy requires insurer to defend even if the suit is groundless, false or fraudulent, the insurer's duty to defend is ascertained by laying the tort complaint alongside the policy . . . . ") (emphasis added). Both Century Policies contain this "groundless, false or fraudulent" language verbatim.

The one exception, identified by both parties, Peerless Ins. Co. v. Viegas, 667 A.2d 785 (R.I. 1995), is inapposite. In Peerless, which involved allegations of sexual molestation of a minor, the Rhode Island Supreme Court looked beyond the pleadings, which alleged "negligence," to infer as a matter of law that the alleged conduct was intentional, and thus subject to the

"intentional act" exclusion of the homeowners policy at issue in the case.  Id. at 788-89 ("A plaintiff, by describing his or her cat to be a dog, cannot simply by that descriptive designation cause the cat to bark.").  Unlike in Peerless, the charging documents in this case did not contain a misstated cause of action (or similar allegations), which would have required that the district court find a potential for coverage as a matter of law.

Nevertheless, Century argues that the case law does not support imposition of the pleadings test here.  Century points out that the Rhode Island Supreme Court has only applied the "pleadings test" in tort cases involving a single insurer.[1]  Admittedly, the

---

[1]  These cases are: Howard v. Guidant Mut. Ins. Group, 785 A.2d 561 (R.I. 2001) (insurer had no duty to defend because allegations that disclosure of sexual relations resulted in injury were excluded by sexual misconduct language of policy); Progressive Cas. Ins. Co. v. Narraganset Auto Sales, 764 A.2d 722 (R.I. 2001) (applying pleadings test and ruling automobile insurer selected by insured had duty to defend tort claim against insured); Shelby Ins., 767 A.2d (duty to defend tort claim continued for single insurer selected because answer raised possibility of coverage); Allstate Ins. Co. v. Russo, 641 A.2d 1304 (R.I. 1994) (applying pleadings and finding homeowners' insurer had no duty to defend tort claim for misrepresenting financial institution's solvency); Mellow v. Med. Malpractice Joint Underwriting Ass'n of R.I., 567 A.2d 367 (R.I. 1989) (applying test where malpractice insurer refused to defend insured and where allegation that injury caused by privacy violation was potentially covered); Hingham Mut. Fire Ins. Co. v. Heroux, 549 A.2d 265 (R.I. 1988) (single selected insurer had duty to defend underlying tort claim filed by motorist); Flori v. Allstate Ins. Co., 388 A.2d 25 (R.I. 1978) (insurer had duty to defend tort action where pleadings alleged negligence, insured requested an actual defense from insurer, and insurer refused to defend citing policy exclusion); Beals, 240 A.2d (negligence claim based on injuries to a child struck by a pencil held by a schoolmate).

circumstances of this case bear little resemblance to the single-insurer tort cases that Century inventories. Likewise, the Rhode Island Supreme Court has not explicitly applied the pleadings test to the CERCLA context with multiple insurers. Nevertheless, we agree with the district court that "the precedents are clear," Emhart, 515 F. Supp. 2d at 246, that the pleadings test applies to the Century Policies at issue.

However, Century maintains that the Rhode Island Supreme Court has, in fact, refused to extend the "pleadings test" to environmental proceedings when it had the opportunity to do so, citing three cases: Truk-Away of Rhode Island, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 309 (R.I. 1999); Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 1138 (R.I. 1999) ("Textron-Gastonia"); Textron, Inc. v. Aetna Cas. & Sur. Co., 754 A.2d 742 (R.I. 2000) ("Textron-Wheatfield").

In Truk-Away, which arose from an EPA CERCLA action relating to contamination of a landfill, the insurers moved for summary judgment on both the duty to defend and the duty to indemnify. 723 A.2d at 310. With respect to the duty to defend, the insurers contended that "the EPA order did not contain any allegations of loss that occurred during the effective periods of the now-expired policies." Id. at 311-12. The trial court allowed the insurers' motions for summary judgment as to the insured's claims on the duty to indemnify and the duty to defend. Id. at

-24-

310, 312 & n.5.  On appeal, the Rhode Island Supreme Court affirmed the trial court, and held that "a careful review of the pleadings, memoranda, and affidavits reveals to us, as it apparently did for the trial justice, that the plaintiffs merely discuss the existence of general solid waste disposal at the site between 1969 and 1985," but no occurrence within the relevant policy periods to trigger coverage.  Id. at 313 (emphasis added).  Century relies on this "affidavits" language to assert that, in Truk-Away, the Rhode Island Supreme Court eschewed the pleadings test and engaged in fact finding to resolve the duty to defend issue.

Century also claims that the court similarly did not apply the pleadings test in Textron-Gastonia and Textron-Wheatfield.  Century claims that in Textron-Gastonia, the Rhode Island Supreme Court purportedly resolved the duty to defend issue on the basis of affidavits and deposition testimony relating to discoverability.  See 723 A.2d at 1144.  In Textron-Wheatfield, Century claims that the Court reversed and remanded the suit without specific direction to apply the pleadings test to the duty to defend issue.  See 754 A.2d at 747.

Century's reliance on Truk-Away, Textron-Gastonia, and Textron-Wheatfield is unavailing.  As to Truk-Away, Century asks us to read the Rhode Island Supreme Court's reliance on "a careful review of the pleadings, memoranda, and affidavits," 723 A.2d at 313, in disposing of both the duty to defend and duty to indemnify

-25-

to mean that the Court looked at outside materials to determine the insurer's duty to defend.  This is too strained a reading.  More plausibly, the Rhode Island Supreme Court found no evidence of an occurrence within the relevant policies' coverage periods anywhere, including the "affidavits," but also the "pleadings."  In fact, the Rhode Island Supreme Court described the defendant insurers' motion for partial summary judgment as to the duty to defend this way: "[T]he defendants asserted that they had no present duty to defend the plaintiffs because the EPA order did not contain any allegations of loss that occurred during the effective periods of their now-expired policies."  Id. at 311-12 (emphasis added).  This language in Truk-Away strongly suggests that both the defendant insurers and the Rhode Island Supreme Court anticipated the application of the pleadings test to determine the insurers' duty to defend, since this language frames the duty to defend issue as turning on the allegations contained in the charging documents, in that case the EPA order.

Century attempts to rehabilitate Truk-Away by arguing that the EPA charging documents there were only silent as to whether there was an occurrence, since there was some evidence of "general solid waste disposal at the site" within the relevant policy periods.  See id. at 313.  According to Century, had the Rhode Island Supreme Court in Truk-Away applied the "pleadings test," then the Court would have construed this silence against the

insurers in that case, and at least found a duty to defend up to the allowance of summary judgment in the insurers' favor as to the duty to indemnify, essentially adopting the approach taken by the district court in this case.

Again Century reads too much into Truk-Away. In Truk-Away, the Rhode Island Supreme Court did not just find "silence." Instead, the Court found that even if such disposal was reasonably discoverable during the policy period, "[i]t is clear that the EPA order was concerned exclusively" with contamination outside the relevant policy periods. See id. at 313 (emphasis added). Accordingly, the charging documents in Truk-Away were not only silent as to coverage, but contained no potential for coverage whatsoever.

Century also reads too much into Textron-Gastonia and Textron-Wheatfield. In Textron-Gastonia the Rhode Island Supreme Court did not apply the pleadings test because the duty to defend was not at issue. Instead, the case concerned recovery for costs incurred in a voluntary cleanup, and, thus, there was no suit to defend. See Textron-Gastonia, 723 A.2d at 1140-41 (instituting voluntary cleanup effort at Gastonia site upon discovery of contamination of on-site soil). Likewise, in Textron-Wheatfield, the Rhode Island Supreme Court did not address the duty to defend at all. See 754 A.2d at 744 (discussing issues on appeal as whether the court "incorrectly applied the trigger-of-coverage

-27-

doctrine" under Rhode Island law and (2) whether the trial court "erred in holding that the pollution-exclusion clauses" precluded coverage). Century points to pleadings in both <u>Textron-Gastonia</u> and <u>Textron-Wheatfield</u> that suggest that the duty to defend was one of the issues presented to the Rhode Island Supreme Court. Even if true, the Rhode Island Supreme Court never discussed the duty to defend issue in either case. Such silence does not sufficiently support Century's claim that the Rhode Island Supreme Court <u>would</u> not apply the pleadings test in the CERCLA context.

Century also asserts a number of policy arguments against the imposition of the pleadings test to this case. For example, Century argues that, in the multiple insurer context, the pleadings test can be used as a "weapon to be wielded at will" against an individual insurer, essentially allowing an insured to pick its insurer for defense purposes. We need not address these concerns here, since the doctrine is clear, and this Court, sitting in diversity, will not overrule the Rhode Island Supreme Court based on policy arguments alone. It was not error for the district court to apply the "pleadings test" to this case.

### 2. **Allocation of Defense Costs**

Century contends in the alternative that the district court erred, as a matter of law, in allocating to Century the total defense costs incurred prior to the jury verdict. We review this ruling of law <u>de novo</u>. <u>See</u> <u>Salve Regina Coll.</u> v. <u>Russell</u>, 499 U.S.

225, 232 (1991) (holding that Courts of Appeals must review de novo district courts' determinations of state law).

As background, the district court, in awarding total defense costs for Century's breach of the duty to defend, rejected Century's claim that Century was "only responsible for a 'pro rata share' of the underlying defense costs." Emhart, 515 F. Supp. 2d at 254. In particular, the district court declined to adopt an alternative scheme of allocation proposed by Century based upon the "time-on-the-risk," which, according to Century, would limit the defense costs "based on the ratio between the periods of Century's coverage [approximately a year] . . . and the period of dioxin exposure alleged by the EPA (fifty-eight years)." Id. at 254-55.

In rejecting the scheme, the court relied upon the "all sums" language in the Century Primary Policy, which obligated Century to pay "all sums which the Insured . . . shall become legally obligated to pay as damages because of . . . property damage," and which further provided that Century "shall have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage." Id. at 255. The district court also relied upon language in the Century Excess Policy that provided that Century "will indemnify the Insured for ultimate net loss in excess of the retained limit," further providing, mirroring the language in the Primary Policy, that Century "will have the right and duty to defend any suit against

-29-

the Insured seeking damages on account of such . . . property damage." Id. Taken together, the district court interpreted the "all sums" and "ultimate net loss" language contained in the Policies as placing no limit on the amount of defense costs that could be allocated to Century. See id. at 254-55 ("Nothing in this language limits Century's defense obligation . . . .").

For further support of this "all sums" approach, the district court relied upon the Rhode Island Supreme Court's decision in Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403 (R.I. 2001). In Kayser-Roth, the Rhode Island Supreme Court imposed most of the indemnity costs on the breaching insurer despite "the existence of Kayser-Roth's other insurance." See id. at 414; see also Emhart, 515 F. Supp. 2d at 255 (applying Kayser-Roth for "'all sums' method," although noting that the Rhode Island Supreme Court did not endorse this approach "in direct terms").

Based on this authority in Kayser-Roth, the clear and unambiguous terms of the "all sums" and "ultimate net loss" language of the Policies, and the rule that any ambiguities should be "strictly construed against the insurer," see Sentry Ins. Co. v. Grenga, 556 A.2d 998, 999 (R.I. 1989), the district court adopted this "all sums" approach. According to the district court, the clear and ambiguous terms of the Policies, combined with the Rhode Island case law, "is enough to defeat Century's complex (and, based

on its ultimate result here, ridiculous) allocation scheme." Emhart, 515 F. Supp. 2d at 255.

Century argues that the district court committed error in using an "all sums" approach to allocate defense costs. Century first contends that the district court, in relying on the "all sums" and "ultimate net loss" language, ignored the language stating that the Policies "appl[y] only to . . . property damage which occurs during the policy period." Century argues that this "during the policy" language limited the amount of defense costs recoverable.

We do not agree that the "during the policy period" language in the Policies limits the amount of recovery. Century relies on Textron, Inc. v. Aetna Cas. & Sur. Co., 638 A.2d 537 (R.I. 1994) ("Textron-BMI") for the proposition that such language does limit recovery. There, Textron, a "named insured," acquired a company after the relevant policy period. Id. at 538. Textron sought coverage for the acquired company's conduct during the policy period, arguing that Textron's insurance should cover the acquired entity's conduct. Id. at 539. The Rhode Island Supreme Court rejected Textron's claim, interpreting the "during the policy period" language of the policy at issue to exclude the acquired company from the "named insureds" since, during the policy period, Textron "had no relationship to the site or to the polluter." Id. at 540-43. In so holding, the Rhode Island Supreme Court viewed

"the policies in their entirety and us[ed] the plain, ordinary, and usual meaning of the words" to refuse to extend coverage to Textron when, during the policy period, it "had no relationship or connection to" the party that actually caused the damage during the policy period. Id. at 541. Century contends that the "during the policy period" language in the Policies similarly restricts the extent of coverage when reading the Policies as a whole.

We view the matter differently. Textron-BMI only addressed whether the "during the policy period" language prevented Textron from recovering for damage caused by a party not named as an insured. It did not address the issue of whether such "during the policy period" language limited the amount recoverable for a breach of the duty to defend.

Even if the "during the policy period" somehow could be extended to limit the total amount recoverable, such an interpretation would contravene the clear and unambiguous terms of the Policies and lead to absurd results. The Rhode Island Supreme Court has eschewed "engag[ing] in mental or verbal gymnastics to hurdle over the plain meaning of the policy's language." Am. Commerce Ins. Co. v. Porto, 811 A.2d 1185, 1193 (R.I. 2002). As stressed by the Court in Textron-BMI, both the "rules of contract" and the "rules of common sense" apply in construing an insurance policy. See Textron-BMI, 638 A.2d at 541.

The "all sums" and "ultimate net loss" language of both Policies do not admit to any limitation, temporal or otherwise. Instead, under the Century Primary Policy, the "during the policy period" language is employed to define an "occurrence" under the policy. Similarly, although the Century Excess Policy does not have a separate "occurrence" definition, the "during the policy period" language is used within the conditional clause defining an occurrence that triggers coverage: "If the limits of liability of the underlying insurance are exhausted because of . . . property damage . . . during the policy period." (emphasis added). While the Rhode Island Supreme Court has not addressed this precise issue, the Massachusetts Appeals Court has taken the above "trigger" interpretation as the more reasonable one under Illinois and Massachusetts law. See Chi. Bridge & Iron Co. v. Certain Underwriters at Lloyd's London, 797 N.E.2d 434, 436, 440-41 (Mass. App. Ct. 2003) (holding that "property damage taking place during the policy period is what triggered [the insurer's] obligation to indemnify, but the policy did not confine the extent of coverage to the policy period in which the property damage occurred.").

Construing the language in the way that Century proposes would also lead to absurd results. It would require the Court to divide the defense costs incurred in this case in such a way as to limit Century's share to the damage caused by Metro-Atlantic during the brief period it purportedly contaminated the Site. Century

-33-

proposed before the district court an allocation scheme based on the ratio of time covered by the Policies (approximately one year) as compared to the total time covered by the EPA action (approximately fifty-eight years), greatly diminishing Century's coverage. Such an allocative mechanism borders on the arbitrary, since other schemes could be proposed. Tellingly, Century does not propose such a scheme (or any scheme) in this appeal.[2] But more importantly, there is no connection between limiting coverage by the policy period and the amount of defense costs, which weighs strongly against reading the Policies in the way that Century proposes.

Century also argues that the district court failed to follow Rhode Island precedent by refusing to allocate damages on a pro rata basis, which would involve dividing Emhart's total defense

---

[2]  In fact, as the district court noted, to adopt this "time-on-the-risk" allocation borders on adopting a "continuous trigger" theory of coverage, in which the existence of dioxin "triggers" coverage every year. See Emhart, 515 F. Supp. 2d at 256. However, as the district court noted, and as we discuss in more detail below, "the Rhode Island Supreme Court has adopted a separate, more circumscribed trigger theory." Id. (citing cases).

To take a simple example, suppose that, over a 40-year period, there were three "occurrences" of dioxin contamination, one in year 1, one in year 20, and one in year 40. According to Century, if the "policy period" of the Primary and Excess Policies occurred during year 1, then Century would only be liable for 1/40th of the defense costs, rather than a more equitable 1/3rd. More importantly, under Rhode Island Law, "occurrence-based" policies that covered years without an occurrence, such as year 5, would not have to extend coverage at all, so it is unclear why such insurers would have to share in the costs.

costs among Emhart's multiple insurers.  Century contends that this approach, which it dubs "proportionate share setoff," is mandated by two Rhode Island Supreme court decisions.  The first, Peloso v. Imperatore, involved the breach of a duty to defend by two concurrent insurers.  434 A.2d 274, 277 (R.I. 1981).  The insured subsequently brought suit against those two insurers for reimbursement of defense costs.  The trial court allocated damages proportionally among both insurers, and the Rhode Island Supreme Court affirmed, holding that "it is proper to prorate defense costs between concurrent insurers when . . . both insurers have wrongfully refused to defend an insured."  Id. at 279.  It noted that failure to prorate would "promote a rule whereby '[t]he insurer who wrongfully breached its duty to defend would be awarded a bonus for having done so, by having another company bear the cost.'"  Id. (quoting Marwell Constr., Inc. v. Underwriters at Lloyd's, London, 465 P.2d 298, 313 (Alaska 1970)).

The second case is Kayser-Roth.  Century emphasizes the fact that the Kayser-Roth court discussed with approval a Third Circuit case, Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440 (3d Cir. 1996).  In Koppers, the Third Circuit reversed and remanded the trial court's imposition of the total costs of defense on an excess insurer without reducing it by the amount of the insured's settlements with other insurers.  Id. at 1456. Reviewing Pennsylvania precedent, the Third Circuit held that

non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, 'exhausted' primary policies, and (2) the combined pro rata shares of other settling (primary and excess) insurers.

Koppers, 98 F.3d at 1455 (emphasis added); see also Kayser-Roth, 770 A.2d at 414 (quoting this language). Although the Kayser-Roth Court did not apply this Koppers rule, it noted that "a setoff may be applied in an appropriate case." 770 A.2d at 414. Century contends that Peloso and Kayser-Roth compel the use of a proportionate share set-off approach to this "appropriate" case.

We disagree. Unlike in Peloso, there is only one breaching party in this case, Century. Accordingly, the concern with a breaching party receiving "a bonus for having done so" is not implicated in this case. Peloso, 434 A.2d at 279. Moreover, for whatever reason, Century did not implead other possible breaching insurers to split the defense costs.

As to Kayser-Roth, we disagree with Century's reading of the case. In Kayser-Roth the Rhode Island Supreme Court addressed the narrow issue of whether a non-settling insurer who breached both the duty to defend and the duty to indemnify, First-State, was entitled to a set-off based on settlements reached by other insurers. See 770 A.2d at 412. The trial court allowed a narrow set-off based on a known settlement, but precluded First State from introducing evidence of other insurers who could have covered

-36-

Kayser-Roth's losses, in part because the proffered documents had "no probative value," and in part because First State was precluded from obtaining settlement documents due to alleged discovery misconduct. See id. at 413. Although the Rhode Island Supreme Court discussed the set-off rule in Koppers, it relied upon the "two different principles" that Koppers was based on: "contract principles and equitable principles." See id. at 414. Applying these principles, the Rhode Island Supreme Court affirmed the district court's imposition of the near total costs to First State because of the lack of evidence of other set-offs and considerations of policy not pertinent here. Id. at 414.

Thus, it is difficult to see how Kayser-Roth supports Century's claim that the district court erred. In fact, the opposite is true. As in Kayser-Roth, the district court applied contract principles by imposing the total defense costs to Century, a breaching insurer, due in this case to the "all sums" language of the Policies. See id. at 414 (noting with approval that, in Koppers, the Third Circuit applied the same approach due to the "all sums" language in policies at issue). Moreover, as in Kayser-Roth, the district court applied equitable principles in giving Century a set-off for the Liberty Mutual settlement, the only known settlement. See Emhart, 515 F. Supp. 2d at 256-57.

Century argues that, unlike in Kayser-Roth, there was no misconduct committed by Century that would have precluded Century

from proving other set-offs. Accordingly, Century argues, it is at least entitled to a remand to prove those set-offs. We disagree. As an initial matter, Century had such an opportunity to prove additional set-offs and failed to do so. Moreover, because there is no evidence in the record that other insurers had a duty to defend, any evidence proposed by Century would only consist of possible insurers, and thus would be too general to provide a basis for a set-off. See Kayser-Roth, 770 A.2d at 413 (rejecting evidence of other potential set-offs in part because proffered documents had "no probative value"). Finally, both Kayser-Roth and Koppers focus on set-offs based on prior settlements, not just possibilities of coverage. In fact, the Koppers language quoted by Kayser-Roth, and highlighted by Century, states that the insurer is entitled to a set-off based on "the combined pro rata shares of other settling (primary and excess) insurers." Koppers, 98 F.3d at 1455 (emphasis added); see also Kayser-Roth, 770 A.2d at 414 (quoting this language). This is exactly what the district court did in this case.

In sum, we find no error in the district court's allocation of defense costs.

## B. The Duty to Defend and Its Breach

### 1. Limitation of Duty to Defend and Damages Up to Jury Verdict

In its cross-appeal, Emhart argues that the duty to defend continues. Accordingly, Emhart contends that the district

court erred in limiting the damages from Century's breach of the duty to defend to only those costs accrued as of the date of the jury verdict. Emhart also contends that the district court erred by holding that OneBeacon did not have a duty to defend under the OneBeacon Policy. As with all rulings of law, we review de novo.

The district court held that "[a]ny duty to defend Emhart in the present case . . . ceased as of the date the jury found in favor of the insurers on the issue of indemnity." Emhart, 515 F. Supp. 2d at 249 & n.22. The district court acknowledged that, generally, "[a]n indemnity finding favorable to an insurer does not erase that insurer's defense obligations, as long as the pleadings test has been satisfied." Id. at 242 n.18. However, the district court held that such a duty ends upon "a finding that the claims do not fall within the risk of coverage; here, the date of the jury's verdict." Id. (citing Shelby, 767 A.2d at 77); see also id. at 249 n.22 (citing a number of cases supporting the proposition that a duty to defend ends when it is shown that there is no potential for coverage).

We agree with the district court's analysis. Emhart argues that the duty to defend continues because the risk of coverage contained in the EPA charging documents remains. In particular, Emhart asserts (without pointing to anything in the record) that the EPA has not decided the scope of CERCLA liability for the Site, and, consequently, the EPA remains free to make

additional allegations and findings that may affect the insurers' duties to indemnify.  According to Emhart, the possibility for coverage, and the resultant duty to defend, remains.

We reject Emhart's claim.  Under Rhode Island law, questions of coverage, including the duty to defend, may be addressed in a separate declaratory judgment action.  See Conanicut Marine Servs., Inc. v. Ins. Co. of N. Am., 511 A.2d 967, 971 n.10 (R.I. 1986).  The parties brought such a declaratory action in this case, and the jury's findings of fact proved that indemnification coverage was not possible, thereby negating any duty to defend.  See, e.g., Shelby, 767 A.2d at 77 ("The plaintiff has a duty to defend the underlying action at trial until there has been a finding of fact that the cause of the collapse was excluded from coverage under the policy or until settlement has been reached.").

Emhart attempts to distinguish this case law.  It claims that although, as a general proposition, a duty to defend can be determined through a separate declaratory judgment action, in this case the EPA is not bound by the district court's findings.  According to Emhart, "[t]his [is] not a case where a declaratory judgment was used to negate coverage on grounds completely unrelated to the underlying allegations, such as late notice to the insurer."

However, this case is closer to a "late notice" situation than Emhart asserts.  Although the EPA is not bound by the district

court's findings, the EPA will not make any determination with respect to the discoverability of the pollutants at issue in this case, because such a determination is completely unrelated to CERCLA liability. See Emhart, 515 F. Supp. 2d at 238 (noting that "[o]f course . . . the charging documents are silent with respect to whether dioxin was discoverable at the Site in 1969"); see also 42 U.S.C. § 9607(a) (indicating that liability is strict). As in a "late notice" declaratory judgment action, the only way to resolve the issue of discoverability is through a separate declaratory judgment action, which is exactly what happened in this case.

Even so, Emhart contends that the jury verdict did not preclude coverage. Emhart maintains that Metro-Atlantic is not responsible for the pollutants. NECC is. Consequently, the jury may have determined that the pollutants were not "discoverable in the exercise of reasonable diligence during the policy periods" because Metro-Atlantic was not responsible for those pollutants, as it would have no reason to test for pollution unless it had contributed to the pollution itself.

Emhart misstates the basis for the duty to defend. The Century Policies do not provide an all-encompensing defense. Instead, the duty to defend under the Policies only arises when, under the pleadings test, the charging documents allege claims that fall "within or potentially within the risk coverage of the

policy." Beals, 240 A.2d at 403.  Here, the charging documents in the EPA action provided such a "potential[]" until the jury verdict showed that any dioxin contamination was not reasonably discoverable, thereby removing all doubt.  The fact that Emhart may be innocent of that dioxin contamination is completely irrelevant to discoverability.

### 2.  OneBeacon's Duty to Defend

In its cross-appeal, Emhart also contends that OneBeacon owes a prospective duty to defend, that the duty to defend continues and that the limits of the Century Policies are likely to be reached.  Because Emhart's claim is premised on its prior claim that the duty to defend continues, we reject it.  For the same reasons, we do not address OneBeacon's claim that the OneBeacon Policy is entitled to reformation.

### 3.  Indemnity as Damages

Emhart also argues in its cross-appeal that it is entitled to full indemnity costs as damages.  It relies on Conanicut Marine Servs., Inc. v. Ins. Co. of N. Am., 511 A.2d 967 (R.I. 1986), in which the Rhode Island Supreme Court awarded total indemnity costs as damages for a breach of the duty to defend. We review de novo.

Conanicut was a slip-and-fall case where a customer injured herself at a marina and sued for damages.  The marina unsuccessfully sought a defense from its insurer.  The marina later

-42-

settled the claim for $18,000, and then sued the insurer to recover the settlement amount. In affirming judgment for the marina, the insured, the Rhode Island Supreme Court held that:

> where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, <u>the award of damages or settlement assessed against the insured.</u>

<u>Id.</u> at 971 (emphasis added). The <u>Conanicut</u> court noted that indemnity as damages would apply even if the judgment or settlement exceeds the policy limits. <u>Id.</u> at 971 & n.9; <u>see also</u> <u>Asermely</u> v. <u>Allstate Ins. Co.</u>, 728 A.2d 461, 464 (R.I. 1999) (insurer who refuses to settle a claim within policy limits is liable for excess judgments).

Emhart pressed its claim for indemnity as damages under <u>Conanicut</u> to the district court, but the court refused. The district court engaged in a lengthy discussion of possible exceptions Century could claim to avoid indemnity as damages, rejecting all and noting that "[t]his leaves Century standing on a precipice." <u>See</u> <u>Emhart</u>, 515 F. Supp. 2d at 260.[3]

The district court, however, ultimately refused to apply <u>Conanicut</u> on two grounds. First, the district court predicted that

---

[3]  Much of the district court's discussion of these exceptions depended on the back and forth between Century and Emhart over locating the Century Primary Policy. Since we affirm the district court in holding that <u>Conanicut</u> does not apply on other grounds, we do not need to discuss this back and forth in any detail.

-43-

Rhode Island courts would not apply Conanicut in circumstances like these, relying on case law that allows a court to "'overrule' an outmoded decision by predicting that the state's highest court would, if presented with the opportunity, do the same." See id. at 261 (citing, among other cases, Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 17 (1st Cir. 1991)). The district court based that prediction on a number of grounds. It noted that a number of courts have rejected the use of "estoppel" in this context; that is, estopping an insurer from disclaiming a duty to indemnify where the insurer has breached the duty to defend. Id. (citing cases). Moreover, Rhode Island state courts have similarly rejected the use of estoppel to extend the scope of insurance coverage. See id. at 261-62 (citing cases). Rhode Island state courts have not applied Conanicut since it was promulgated, and courts in other jurisdictions have rejected applying a similar Conanicut rule in the CERCLA context. Id. at 262 (citing cases). Taken together, the district court concluded that it was unlikely that the Rhode Island courts would apply Conanicut on an "estoppel" rationale to this context. Id. at 262.

Second, the district court ruled that, under Rhode Island law, "the proper measure of damages for breach of contract is that which the injured party can tie to the breach itself." Id. at 263. Since "Emhart has not proven any contract damages beyond the costs

of defense," the district court held that Emhart was not entitled to indemnity.  Id.

We agree with the second ground.  Both parties spill a lot of ink on the first ground, arguing back and forth over whether Rhode Island courts would extend Conanicut to this case, citing numerous authorities.  However, in its briefing Emhart contends that "Conanicut is not based on principles of estoppel or waiver," and, accordingly, it is only entitled to "the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract."  Conanicut, 511 A.2d at 971 (quoting Comunale v. Traders & Gen. Ins. Co., 328 P.2d 198, 202 (Cal. 1958)) (emphasis added).  Thus, Emhart argues that Conanicut is entirely consistent with existing Rhode Island precedent, and does not require this Court to address whether it is "outmoded" in the least.

Of course, Emhart cannot, and does not, show that the entire cost of the cleanup was caused by the breach.  To get around this, Emhart conceives of Conanicut as "implicitly" promulgating a "bright line" rule that applies given the inherent difficulty in determining the damages caused by a breach of the duty to defend.  As Emhart admits, Conanicut itself does not contain any such "bright line" language.  Emhart only points to an unpublished opinion that rationalizes a similar rule in this way.  See Total Petroleum, Inc. v. Hartford Acc. & Indem. Co., No. 96-1736, 1997 WL

704932, at *3 (6th Cir. Nov. 7, 1997) (unpublished decision) ("One basis for this rule seems to lie in the law's reluctance to allow the insurer to benefit from the uncertainty created when it renounces its duty.").

Even if Conanicut could be read as imposing a bright line rule for the imposition of damages, which we doubt, at a minimum Emhart would still have to provide some showing that Emhart's failure to defend caused it damage with respect to its liability in the EPA proceedings. As with all breaches of contract, the burden is on the breached party to prove damages. See George v. George F. Berkander, Inc., 169 A.2d 370, 373 (R.I. 1961) (affirming trial court's determination that "the complainant had failed to sustain the burden of proving that he had incurred any damage by reason of the breach.") (emphasis added). There is nothing in the record to suggest that Emhart incurred any damages from Century's breach beyond its defense costs, thus triggering such a bright line rule.

Moreover, in the absence of some showing of damage, applying Conanicut "mechanical[ly]," see Emhart, 515 F. Supp. 2d at 260, would risk conflicting with Rhode Island and Supreme Court precedent, since the only remaining rationale for imposition of damages would be estoppel or punitive. As noted earlier, Rhode Island courts have refused the application of "estoppel" to extend insurance coverage. See, e.g., Zarrella v. Minn. Mut. Life Ins. Co., 824 A.2d 1249, 1260-61 (R.I. 2003) (holding, without

-46-

discussing Conanicut, that the "doctrine of equitable estoppel shall not apply . . . to enlarge the scope of insurance benefits"). It would also put this Court in the thorny position of determining whether such an award, to the tune of close to $100 million, would violate the Due Process Clause. Cf. State Farm Mut. Ins. Co. v. Campbell, 538 U.S. 408 (2003) (striking down $145 million punitive damages award against insurance carrier, where jury held that plaintiff was entitled to only $1 million in compensatory damages).

The district court was therefore correct to demand some evidence of a relationship between Century's breach and Emhart's damages, thus avoiding significant issues concerning Rhode Island precedent, not to mention constitutional law. Cf. United States v. Vilches-Navarrete, 523 F.3d 1, 10 n.6 (1st Cir. 2008) ("The maxim that courts should not decide constitutional issues when this can be avoided is as old as the Rocky Mountains and embedded in our legal culture for about as long."). We accordingly find no error.

**C.  The Jury Verdict**

In its cross-appeal, Emhart also raises various challenges to the jury verdict.

**1.  "Continuous Trigger" or "Injury-in-Fact" Instruction**

Emhart challenges the district court's jury instruction with respect to the appropriate "trigger of coverage" for the duty to indemnify under the Century Policies and the OneBeacon Policy. Emhart contends that the district court should have instructed the

jury using a "continuous trigger" or "injury-in-fact" standard.  A "continuous trigger" standard "charges a loss to policies in effect from the time of exposure to manifestation," and, thus, presumes injury from the time of exposure through manifestation.  Emhart, 515 F. Supp. 2d at 256.  In contrast, an "injury-in-fact" standard triggers coverage only when an "injury" occurs during the policy period.

A refusal to give an instruction is "'reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case.'" Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 76 (1st Cir. 2002) (quoting United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995)).

We reject Emhart's claim.  All three Policies trigger coverage based upon an "occurrence" during the relevant policy periods.  This Court certified the question of what trigger applies to such occurrence policies to the Rhode Island Supreme Court in CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647 (R.I. 1995).  As put by the Rhode Island Supreme Court:

> The question certified by the First Circuit asks us to determine, under Rhode Island law, when there has been an "occurrence" sufficient to trigger coverage under a general liability policy when the insured sustains a chemical spill that results in a property loss that is not discovered until years after the spill took place. We answer that an "occurrence"

under a general liability policy takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable.

Id. at 649 (emphasis added). The district court relied on CPC to instruct the jury in this case, stating the issue on the verdict form as follows: "With respect to the Century Primary, Century Excess, and OneBeacon Policies, was dioxin contamination discoverable in the exercise of reasonable diligence during the policy periods?" Since the parties did not dispute that the dioxin contamination at issue in this case failed to manifest itself and was not discovered during the Century and OneBeacon policy periods, the district court focused solely on whether the dioxin contamination was "discoverable in the exercise of reasonable diligence during the policy periods." See Emhart, 515 F. Supp. 2d at 238.

We start backwards. Emhart contends that it was entitled to an "injury-in-fact" instruction, but that is exactly what the district court provided. In devising what the district court called a "discovery/manifestation/discoverability trigger" for occurrence-based policies, see id. at 265, the CPC Court explicitly incorporated an "'injury-in-fact' theory." CPC, 668 A.2d at 649; see also id. at 649-50 (finding support for test in Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 24 (1st Cir. 1982), which interpreted "occurrence" under the policy to mean "no

more than that [the] <u>injury must result during the policy period</u>." (emphasis added)). The <u>CPC</u> court simply provided a more technical definition of "injury-in-fact" in this context, one that not only requires damage, but that the damage be manifest, discovered, or discoverable. Thus, an "injury-in-fact" theory was "substantially incorporated into the charge as rendered." <u>Seahorse Marine Supplies</u>, 295 F.3d at 76.

Emhart's claim concerning the "continuous trigger" standard also falters. Here Emhart contends that the plain terms of the Policies permit recovery so long as there is an occurrence, defined under the Policies as "injurious exposure to conditions, which results, during the policy period, in . . . property damage . . . neither expected nor intended from the standpoint of the insured." Based on this language, Emhart argues that all that was needed was a showing of "exposure to conditions" causing "property damage" during the relevant policy periods, which Emhart provided.

However, substantially similar terms were used in the policy at issue in <u>CPC</u>, where an "occurrence" was defined as "[a]n accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in . . . Property Damage . . . neither expected nor intended from the standpoint of the Insured." <u>CPC</u>, 668 A.2d at 649. The Rhode Island Supreme Court interpreted this language to mean that "there can be no occurrence under the policy without property damage <u>that</u>

becomes apparent during the policy period." Id. (emphasis added). Thus, it concluded that "'[p]roperty damage' and 'occurrence' are . . . inextricably intertwined." Id. Under the Policies in this case, "property damage" and "occurrence" are also "inextricably intertwined," since, as in the policy in CPC, there is no "occurrence" unless there was "property damage . . . during the policy period." Accordingly, Emhart fails to show why CPC would not apply to the "occurrence"-based Policies in this case.

Next, Emhart claims that the "considered dicta" of the Rhode Island Supreme Court supports the use of a "continuous trigger" standard. See Honey Dew Assocs., Inc. v. M & K Food Corp., 241 F.3d 23, 27 (1st Cir. 2001) (absent a definitive ruling by the state's highest court, the federal courts may refer to "considered dicta" to ascertain how the state court would rule). Emhart cites Textron-Gastonia, where the court found coverage based on the discovery/manifestation/discoverability trigger and, thus, did "not address the continuous trigger-of-coverage standard." 723 A.2d at 1141. Emhart also cites Truk-Away, where the insured pressed a "continuous-trigger" standard, but the court found no coverage since there was no evidence of property damage, continuous or otherwise, during the policy periods. 723 A.2d at 313.

Even if this so-called "considered dicta" supported the use of a "continuous trigger" standard, Emhart would still have to distinguish CPC, which is the definitive ruling with respect to

-51-

triggers of coverage for "occurrence"-based policies. See Textron
-Wheatfield, 754 A.2d at 745-46 (reiterating CPC discoverability
standard, noting that "the 'discoverability' trigger in [CPC]
descends from a long and venerable line of insurance cases.");
Textron-Gastonia, 723 A.2d at 1144 ("Textron's burden . . . is not
met by merely establishing evidence to suggest that the
contamination was present during the policy period.  Rather, CPC
requires that the contamination not only exist during the period of
coverage, but also be discoverable in the exercise of reasonable
diligence.") (emphasis added).  Emhart has not done so, and,
accordingly, we find no error.

## 2.  "Objective" Standard

Emhart argues in the alternative that the district court
erred in instructing the jury to consider whether Crown-Metro
subjectively had a reason to test for contamination.  "We review
jury instructions de novo.  We reverse the giving of an instruction
if it (1) was misleading, unduly complicating, or incorrect as a
matter of law, and (2) adversely affected the objecting party's
substantial rights."  SEC v. Happ, 392 F.3d 12, 28 (1st Cir. 2004)
(citations and quotation marks omitted).

The district court used the following trigger instruction
with respect to Century and OneBeacon:

> Under the circumstances of this case, the
> Century and OneBeacon policies can be
> triggered only if property damage was

discoverable in the exercise of reasonable diligence during the policy periods.

That is, whether by exercising reasonable diligence Crown-Metro, the successor to Metro-Atlantic, could have discovered the dioxin contamination during the policy periods applicable to the Century and OneBeacon policies. Note that Emhart does not need to show that property damage was actually discovered during the policy periods.

With respect to the question of whether the property damage was discoverable in the exercise of reasonable diligence, you must consider two issues. The first is was dioxin contamination capable of being detected at the site during the policy periods. This requires Emhart to show that dioxin contamination actually existed at the site during the policy period as well as the existence of technology and expertise that could have detected that dioxin contamination.

The second issue is did Crown-Metro have a reason to test for dioxin contamination at the site during the policy period or other contamination that would have led to the discovery of dioxin contamination at the site during the policy period.

Considering all of the evidence then, you must decide whether Crown-Metro, in the exercise of reasonable diligence, could have discovered the dioxin contamination.

Emhart objects to this language: "The second issue is did Crown-Metro have a reason to test for dioxin contamination at the site during the policy period or other contamination that would have led to the discovery of dioxin contamination at the site during the policy period."  (emphasis added).

We see no error. The Rhode Island Supreme Court has described the discovery/manifestation/discoverability trigger in precisely those terms. See, e.g., Textron-Wheatfield, 754 A.2d at 745 ("the insured had reason to test for the property damage"); Textron-Gastonia, 723 A.2d at 1144 ("Textron must have had some reason to test for the contamination"). Moreover, throughout the instruction the district court emphasized that the contamination was discoverable in the "exercise of reasonable diligence," which entails taking an objective perspective. (emphasis added).

### 3. Choice of Law for North River Policy

We turn to the North River Policy. Emhart argues that this Court should certify the question of what state law would apply to the North River Policy, which does not have a choice-of-law provision. Emhart contends that Rhode Island law applies to the Policy. However, based on the magistrate judge's report in this case, the district court applied New York law to the North River Policy.

In the report, the magistrate judge applied a 2004 precedent, DeCesare v. Lincoln Benefit Life Co., 852 A.2d 474, 483-84 (R.I. 2004), to determine what choice-of-law principles apply to the North River Policy. DeCesare held that "[i]n the absence of a contractual stipulation about which law controls, Rhode Island's conflict-of-laws doctrine provides that the law of the state where the contract was executed governs." Id. at 483-84. On that basis,

-54-

the Magistrate Judge applied New York law, since the parties stipulated that the North River Policy was executed in New York.

We see no basis for certifying the issue to the Rhode Island Supreme Court. DeCesare remains good law, and nothing subsequent to DeCesare holds to the contrary. At best, Emhart only shows that pre-DeCesare precedent may apply an "interest-weighing" analysis. See, e.g., Gordon v. Clifford Metal Sales Co., 602 A.2d 535, 538-39 (R.I. 1992) (applying "interest-weighing" analysis based upon Title 6 of the Rhode Island Uniform Commercial Code). Thus, we find the law "sufficiently clear" to make "certification . . . both inappropriate and an unwarranted burden on the state court." See In re Citigroup, Inc., 535 F.3d 45, 62 (1st Cir. 2008).

### 4. "Sudden and Accidental" Exclusion

Finally, and in the alternative, Emhart claims that the district court committed error in its instruction concerning the "sudden and accidental" exclusion of the North River Policy. As with our review of the previous jury instructions, we review de novo.

The "sudden and accidental" exclusion allows for coverage if a "discharge, dispersal, release, or escape" that otherwise satisfies the pollution exclusion of the North River Policy was "sudden and accidental." The jury found that the "sudden and accidental" exclusion did not apply in this case.

-55-

Emhart objects to the following language in the instruction:

> Moreover, once you've determined when the initial release occurred, intervening events, although they might be sudden and accidental, cannot be considered for purposes of the exception to the exclusion.
>
> Thus, for instance, where the initial release discharged pollutants onto the land, an intervening fire or flood cannot satisfy the sudden and accidental exception. Instead, you must determine whether the initial discharge event was itself sudden. It may be the case, however, that the fire was the initial discharge event, assuming that the fire caused the at-issue property damage, in which case it would be proper to determine whether this event was sudden.

(emphasis added). Emhart claims that the district erred in focusing solely on the initial dispersal, and that it is entitled to coverage because it presented evidence of subsequent flooding that "dispersed" the contaminants onto the Site.

Emhart relies on a single case, Farm Family Mut. Ins. Co. v. Bagley, 409 N.Y.S. 2d 294 (App. Div. 1978), where the New York Appellate Division distinguished between "discharge" and "dispersal," and held that "the word 'dispersal' may refer to the original release or it may refer to a secondary dissemination after the original release." Id. at 296 (quoting Webster's Third New World Dictionary) (emphasis added). The district court relied on a more recent case, Northville Indus. Corp. v. Nat'l Union Fire Ins. Co., 679 N.E.2d 1044 (N.Y. 1997), where the New York Court of

-56-

Appeals, when interpreting the same policy language, did not make the distinction and, instead, held that "[t]he focus . . . is on the initial release of the pollutant, not on . . . the timespan of the eventual dispersal of the discharged pollutant in the environment." <u>Id.</u> at 1048. Emhart tries to parse <u>Northville</u>, arguing that it is factually distinct and that its pronouncement is dictum. We see no indication that <u>Northville</u> would not apply to this case. <u>See</u> <u>Employers Ins. of Wausau</u> v. <u>Duplan Corp.</u>, 1999 WL 777976, at *11-12 (S.D.N.Y. Oct. 20, 1999) (holding, following <u>Northville</u>, that "sudden and accidental" precluded liability for subsequent dispersals of discharged contaminants due to fires and floods).

## III. <u>Conclusion</u>

For the foregoing reasons, we affirm the district court in all respects.

**<u>Affirmed</u>**.

Costs to the prevailing parties.